CITY OF SAN ANTONIO, Appellant,

v.

Michael HEIM, Appellee.

No. 03–95–00021–CV.

Court of Appeals of Texas, Austin.

Oct. 9, 1996.

Rehearing Overruled Nov. 20, 1996.

Thomas H. Crofts, Jr., Crofts, Callaway & Jefferson, San Antonio, for Appellant.

Douglas Brothers, Brothers & Associates, Austin, for Appellee.

Before POWERS, ABOUSSIE and KIDD, JJ.

## ON MOTION FOR REHEARING

POWERS, Justice.

We withdraw our previous opinion of July 31, 1996 and substitute the following. Michael Heim recovered judgment for compensatory and punitive damages in his suit against the City of San Antonio under the Texas Whistleblower Act (the "Act"). *See* Act of May 22, 1993, 73d Leg., R.S., ch. 268, § 1, 1993 Tex. Gen. Laws 583, 609–11 (Tex. Gov't Code Ann. §§ 554.001–009, since amended) (hereinafter "Former Code"). The City appeals. We will affirm the judgment.

### THE CONTROVERSY

Heim is employed as a police officer in the "DWI" task force of the San Antonio Police Department (the "Department"). On November 15, 1991, he arrested an off-duty police officer, Sergeant Garza, for driving while intoxicated. *See* Tex. Penal Code Ann. § 49.04 (West 1994). Heim became the subject of a series of disciplinary suspensions beginning the next day.[1]

In August 1992, Heim sued the City under the Whistleblower Act alleging the suspensions were part of a course of discrimination by other officers and supervisors in the Department, taken against him in retaliation for his arresting Sergeant Garza contrary to an unwritten practice in the Department of not arresting fellow officers or their family members—a practice of "professional courtesy." The jury answered special questions in Heim's favor and found $594,000 in compensatory damages[2] and $500,000 in exemplary damages. The trial court rendered judgment on the verdict. The City's motion for new trial was overruled by operation of law. This appeal ensued.

---

1. The suspensions from duty were as follows: five days on November 16, 1991, for having previously criticized a judge's decision; five days for transporting multiple suspects on November 17, 1991, in violation of Department policy; fifteen days for reporting untruthfully events surrounding an arrest Heim made on November 18, 1991; one day for failing adequately to search an arrested person found with a knife at the "Detox" facility in November 1991; thirty days for untruthfulness and failing adequately to search an arrested person found with a pocket knife in May 1992; and thirty days for handling an injured person improperly in June 1992, and for failing to follow Department procedure pertaining to suspects with a breath-test result less than .10 amount of alcohol.

2. The compensatory-damage awards are as follows: (1) $15,000 for loss of past earning capacity; (2) $40,000 for loss of future earning capacity; (3) $35,000 for loss of retirement and other employee benefits; (4) $250,000 for past mental anguish; (5) $250,000 for future mental anguish; and (6) $4,000 for arbitration and out-of-pocket expenses plus pre-judgment and post-judgment interest.

## LIABILITY UNDER THE WHISTLEBLOWER ACT

At the relevant time, the Act provided as follows:

A state agency or local government may not suspend or terminate the employment of or discriminate against a public employee who in good faith reports a violation of law to an appropriate law enforcement authority.

Former Code § 554.002. On appeal, the City does not dispute that Heim acted in good faith in arresting Sergeant Garza or that Heim's reports were made to an appropriate law-enforcement authority.[3] Instead, the City contends in point of error one that Heim did not establish a cause of action because Garza's arrest was not a "violation of law" within the meaning of the Act. In point of error two, the City re-urges its contention by assigning error to the trial court's refusal to instruct the jury that a "violation of law" requires under the Act an "employer-related" violation.

■ The city's theory is as follows: To come within the Act, the reported "violation of law" must pertain to the government entity's *internal* administration. See, e.g., *Texas Dep't of Human Servs. v. Green*, 855 S.W.2d 136, 140 (Tex.App.—Austin 1993, writ denied) (agency employee's report of fraud and corruption among agency contract-procurement officers); *City of Houston v. Leach*, 819 S.W.2d 185, 188–89 (Tex.App.—Houston [14th Dist.] 1991, no writ) (auditor's report of illegal acts in use and furnishing of city property and services); *City of Ingleside v. Kneuper*, 768 S.W.2d 451, 453 (Tex.App.—Austin 1989, writ denied) (supervisor's report of building inspector's criminal acts in performing official duties). Garza's driving on a public street while intoxicated and while off-duty did not involve the internal administration of the police department; therefore,

Heim's report of Garza's violation of law did not come within the Act. We disagree with the theory. Even if it is a correct theory, however, the evidence at trial satisfies the distinction claimed in the City's theory.

■ The cause of action created in the Whistleblower Act is purely statutory. We have held the Act has two remedial purposes: (1) to enhance openness in government by protecting public employees from retaliation by their employer when an employee reports a violation of law in good faith; and (2) to secure in consequence lawful conduct on the part of those who direct and conduct the affairs of government. *Travis County v. Colunga*, 753 S.W.2d 716, 718–19 (Tex.App.—Austin 1988, writ denied); *see also Green*, 855 S.W.2d at 142. The elements of the cause of action, at the time material here, were as follows: (1) a state agency or local government (2) suspends, discharges, or discriminates (3) against a public employee (4) who reports in good faith a violation of law (5) to an appropriate law-enforcement authority.[4] The statute is not ambiguous in any respect. Neither the right nor the remedy exists at common law; the provisions of the Act are exclusive and a court may not add to them. See *Mingus v. Wadley*, 115 Tex. 551, 285 S.W. 1084, 1088 (1926). A court may act only in the manner provided in the statute that created the right. See *Bullock v. Amoco Prod. Co.*, 608 S.W.2d 899, 901 (Tex.1980). We therefore are not free to add the limiting qualification the City seeks.

■ The record shows in all events that Heim's report of Garza's violation *did* pertain to the internal administration of the Department. Garza's criminal act in driving while intoxicated, if true, was a violation of his official duty *as a police officer* to obey as well as enforce the law. Tex.Code Crim. Proc. Ann. art. 2.13 (West 1979); See *Davis v. Passman*, 442 U.S. 228, 246, 99 S.Ct. 2264, 2277, 60 L.Ed.2d 846 (1979). His intoxication

---

3. Heim reported Garza's offense to the Department and to the Bexar County District Attorney. Heim reported to William Gibson, the Police Chief, the unlawful acts of retaliation and discrimination against Heim discussed in our opinion.

4. The current version of the Act protects against retaliation for "reports of violation of law *by the entity or another public employee.*" Tex. Gov't Code Ann. § 554.002 (West Supp.1996) (emphasis added). The addition of the emphasized portion in the disjunctive further suggests that the reported violation need not concern only internal wrongdoing by the government entity.

was, in addition, a violation of Department regulations requiring that police officers maintain at all times their competency and availability for duty.[5] And the internal discrimination against Heim was, if his evidence is believed, grounded in Garza's arrest.[6] The practice of such discrimination, which Heim reported to his superiors and which the jury implicitly believed occurred, itself constitutes a patent violation of law in the Department's internal administration and is inimical to public safety and an overriding public interest in genuine and impartial law enforcement.[7]

We hold Heim's reports came within the letter, spirit, and purpose of the Act. We therefore overrule points of error one and two.

█ In point of error three, the City contends the evidence is legally insufficient to support the jury verdict. The City argues that our review of the evidence must be made under the following theory of causation: "the employee's protected conduct must be such that, without it, the employer's prohibited conduct would not have occurred when it did." *Department of Human Servs. v. Hinds*, 904 S.W.2d 629, 636 (Tex.1995). In

contrast, the liability question was submitted to the jury as follows:

Did the City of San Antonio discriminate against Heim in retaliation for reporting in good faith a violation of law to an appropriate law enforcement authority?

The case was not tried under the *Hinds* theory and the City did not suggest to the trial court, by request, objection, or otherwise, that a causation element was omitted from the charge. On appeal, parties are restricted to the theory on which the case was tried. *Davis v. Campbell*, 572 S.W.2d 660, 662 (Tex.1978). We will therefore summarize and review the sufficiency of the evidence under the theory of liability submitted to the jury. *See Syndex Corp. v. Dean*, 820 S.W.2d 869, 873 (Tex.App.—Austin 1991, writ denied); *cf. Hinds*, 904 S.W.2d at 637–38.

Numerous witnesses testified that the Department discriminated against Heim in retaliation for his arresting Garza in violation of the Department's unwritten code of "professional courtesy."[8] After Garza's arrest, Heim was the subject of nine complaints, made mainly by persons within the Department, alleging various violations of Department regulations. Following investigations by the Department's Internal Affairs ("IA") Section, Chief of Police Gibson suspended

---

5. A reported "violation of law" to which the Act applies includes violation of a provision of a civil or criminal statute, state or federal constitution, or an administrative rule or regulation. *See Castaneda v. Texas Dep't of Agric.*, 831 S.W.2d 501, 503 (Tex.App.—Corpus Christi 1992, writ denied); *see also* Former Code § 554.001(1); *Colunga*, 753 S.W.2d at 719.

6. The testimony of nine police officers as well as the events surrounding Garza's arrest indicate the existence of the practice. After being stopped, Sergeant Garza ordered Heim to call a supervisor to the scene before arresting him and later filed a complaint against Heim for not following this order. Garza was released from the "Detox" facility before being taken to a magistrate, contrary to the standard procedure following an arrest. Notwithstanding that Heim and his supervisor attested to Garza's drunkenness, Chief of Police Gibson took no disciplinary action against Garza and the charges were dropped.

Sergeant Jacobs, who, according to testimony, was assigned to the DWI unit after Garza's arrest to "slow a train down that was out of control," promulgated a new procedure. This procedure,

commonly referred to as the "Michael Heim procedure," requires that a supervisor be called to the scene before an off-duty officer may be arrested for driving while intoxicated. The merit in this procedure is obvious. It was not in effect, however, when Heim arrested Garza.

7. A police officer's failure to arrest another for violating a penal law may be construed as a dereliction of duty as well as a violation of the Texas Penal Code. *See* Tex.Code Crim. Proc. Ann. art. 2.13 (West 1979); *see also* Tex. Penal Code Ann. § 38.05 (criminal offense to provide another with means of avoiding arrest with intent to hinder arrest, prosecution, conviction, or punishment for commission of criminal offense); *Kousal v. Texas Power & Light Co.*, 142 Tex. 451, 179 S.W.2d 283, 287–88 (1944).

8. The City does not contest liability on the ground that the City is not vicariously liable for the actions of the Department. The Department and the City are the same unit of government for purposes of the Act. *See Wichita County v. Hart*, 892 S.W.2d 912, 929 (Tex.App.—Austin 1994), *rev'd on other grounds*, 917 S.W.2d 779 (Tex. 1996).

Heim six times for a total of eighty-six days.[9] In the eleven years Heim served on the police force before the Garza arrest, Heim averaged less than two complaints per year, filed mainly by civilians, and received only one three-day suspension in 1989. The jurors were free to assign weight to the timing, number, and severity of the post-Garza complaints and disciplinary suspensions in light of Heim's previous conduct record and the date of Garza's arrest. In addition, the jury could reasonably believe the actions taken against Heim were part of an institutional practice. Two officers testified they also received suspensions and transfers to other duties following their reports of misconduct by fellow officers.

The evidence also reasonably permits an inference that Heim's suspensions resulted from selective enforcement of Department regulations. Several officers testified that many of the violations for which Heim was suspended were regularly committed by other officers but did not result in disciplinary action against the offenders. For example, the evidence showed there had been only one reported violation of the contraband-search rule by any officer during the previous year but Heim was suspended twice in seven months, for a total of thirty-one days, when contraband was found on his prisoners. At trial, Chief Gibson conceded that Sergeant Morales, supervisor of the "Detox" unit, might have selectively enforced against Heim the contraband-search rule.[10]

The record contains testimony that during a meeting in March 1992, Sergeants Hooks and Jacobs, supervisors of the DWI unit, threatened Heim's job security and personal safety. Sergeant Hook told Heim that he needed to "back off" and start conforming. Hook said he did not want to see Heim get hurt. Heim was told that he had a wife and family to look after and that he was too old to look for another job. He was required to attend unusually long meetings with his supervisors and was reprimanded for deficiencies a fact finder might believe concocted and harassing, such as illegible handwriting.

Moreover, discriminatory treatment against Heim by numerous fellow officers was so pervasive under the evidence that the jury could reasonably infer that it was tacitly condoned by the Department. Heim received "hang-up" calls on his unlisted home telephone, his belongings were stolen, and his car was twice towed from work. Witnesses testified that other officers refused to sit next to Heim and the forms of retaliation they planned against Heim for arresting Garza. Most seriously, the record contains evidence that beginning immediately after Garza's arrest officers failed to respond to Heim's radio messages requesting back-up assistance in the field, thereby jeopardizing his personal safety and the public safety. The jurors were free to conclude that such failures were intentional and retaliatory.

And the evidence reasonably permits an inference that by turning a blind eye to much of the retaliation Chief Gibson tacitly ratified it. Chief Gibson had five meetings with Heim concerning his allegations of discrimination and received letters from Heim's attorney regarding those matters. The Chief explained that he relied on IA to investigate many of Heim's allegations; the evidence suggests, however, that IA's investigations were not entirely objective or impartial when Heim was the subject.[11] Furthermore, the

---

9. Under Department rules, suspensions may be imposed only by the Chief of Police based upon an investigation by the Internal Affairs Section of an alleged violation of Department regulations. The Internal Affairs Section is composed entirely of sergeants, officers holding higher rank than Heim.

10. Heim testified without objection that Sergeant Morales specifically instructed detention guards to search Heim's prisoners more carefully than other officers' prisoners and to notify Morales in order that he might personally supervise the searches of Heim's prisoners.

11. As mentioned previously, Heim was suspended when IA concluded he failed to follow a required Department procedure pertaining to suspects whose breath test showed less than .10 quantity of alcohol. The procedure was purportedly promulgated orally by Sergeant Jacobs during the course of a meeting of the DWI unit. Heim tape recorded the meeting. The recording demonstrated that no such order was promulgated. Concerning his suspension for transporting multiple suspects, Heim adduced evidence that IA investigating officers failed to inquire into Heim's claim that his action was justified in the circumstances because other officers failed to

record is devoid of evidence that Chief Gibson took *any* action following Heim's report of the threats made by Sergeants Hooks and Jacobs. In fact, Chief Gibson assigned Sergeant Jacobs to supervise Heim's DWI unit a few months after Garza's arrest. The jury could reasonably believe from the evidence that, in regard to the events for which Heim was suspended, Chief Gibson unjustifiably disregarded Heim's explanations of the surrounding circumstances and selectively imposed unduly harsh suspensions.

The evidence, both direct and circumstantial, supports a finding of liability based on the test of liability submitted to the jury. We therefore overrule point of error three.

■ In point of error four, however, the City contends the test of liability submitted to the jury was incorrect. The City argues that the trial court committed reversible error by refusing the City's request for an instruction that liability under the Act must be based on retaliatory conduct engaged in or ratified by "city officials who possess the power to hire, fire, suspend, demote and promote." The trial court instructed the jury instead that the City "acts through its officers, agents, and employees."

The instruction given by the trial court is a correct statement of law. The court in *Green* construed the Act to protect a public employee not only from the conduct of an individual supervisor but also from "the collective acts of the agency, the bureaucracy, the institution, the *system* that retaliates." 855 S.W.2d at 143 (emphasis added). Thus, had the trial judge granted the City's requested instruction, she would have misstated the law.

In any event, the evidence shows retaliation against Heim by officers holding supervisory positions in the Department. And there is at least circumstantial evidence that retaliation by lower-ranking officers was ratified by the Department.[12] Under these circumstances, any error in the submission of the jury instruction was therefore harmless. Tex.R.App. P. 81(b)(1). We overrule point of error four.

## EXEMPLARY DAMAGES

■ In point of error five, the City contends the evidence is legally insufficient to support the jury's finding of malice, a prerequisite to an award of punitive damages under the Act. See *Kneuper*, 768 S.W.2d at 457; see also *Hart*, 892 S.W.2d at 927. The issue of malice was submitted to the jury (conditioned on a finding of liability) with the following definition:

> "[M]alice" means (a) conduct in retaliation that is intended by the City of San Antonio to cause Michael Heim substantial injury; or (b) an act carried out by the City of San Antonio with a flagrant disregard for the rights of Plaintiff and with actual awareness on the part of the City of San Antonio that the act will, in reasonable probability, result in harm.

The City contends punitive damages are not recoverable under the Act unless the plaintiff proves malice or evil intent on the part of a "policy-making official" of the municipality, in this case Chief Gibson.[13] The City failed to

respond to his radio message requesting back-up assistance.

12. An exhaustion of administrative remedies, as required by the Act, provides the governmental entity an opportunity to correct a problem before subjecting itself to liability for retaliation solely by lower-level employees. *See* Former Code § 554.006; House Research Organization, Bill Analysis, Tex. H.B. 1405, 71st Leg., R.S. (1989); *see also Public Util. Comm'n v. Pedernales Elec. Coop.*, 678 S.W.2d 214, 220 n. 3 (Tex.App.—Austin 1984, writ ref'd n.r.e.).

In addition to the meetings with Chief Gibson, Heim brought his allegations of retaliation to the Department's attention through the available grievance procedures by arguing on administrative appeal of his suspensions that he was being

singled out by supervising officers for selective enforcement of the rules and that at least some of his rule violations were justified under the circumstances because, for instance, other officers failed to respond to his requests for back-up assistance.

13. The City cites *City of Gladewater v. Pike*, 727 S.W.2d 514, 523 (Tex.1987), for this proposition. *Gladewater* dealt with whether punitive damages were recoverable, although not authorized by statute, in an action against a municipality for negligence in the exercise of its proprietary functions. *See Gladewater*, 727 S.W.2d at 519. The holding is inapposite in whistleblower actions because exemplary damages are specifically authorized by the Act. *See* Former Code § 554.003. In any event, the term "policy-making

submit an instruction regarding its theory. The City argues in point of error four, nevertheless, that the trial court, in submitting the malice issue, committed reversible error by instructing the jury generally that "the City acts through its officers, agents, and employees."

Nothing in the Act itself suggests that punitive damages may only be assessed for the actions of the highest-ranking official in a department. *See* Former Code § 554.003. Such a restriction would be inconsistent with the policy of protecting employees from institutional retaliation. As previously discussed, the Act protects against pervasive retaliation by an entire institution as well as acts attributable to a single official. *See Green,* 855 S.W.2d at 143. We find the record contains evidence from which the jury could reasonably infer that the Department as an institution acted with malice in retaliating against Heim.

Because the evidence is sufficient to support the jury's finding of malice on the part of the City, we overrule point of error five. We also overrule the remainder of point of error four. Based on the record before us, moreover, any error in the submission of the challenged jury instruction was harmless. *See* Tex.R.App. P. 81(b)(1).

■■■ In point of error six, the City contends in the alternative that it is entitled to a new trial because the jury's $500,000 award of punitive damages is excessive. The purpose of appellate review of punitive-damage awards is to make "certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition." *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 21, 111 S.Ct. 1032, 1045, 113 L.Ed.2d 1 (1991). We may reverse a punitive-damage award or suggest a remittitur only if we determine the evidence supporting the award is so factually insufficient or the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 30 (Tex.1994); *see*

*also Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986). We should consider in our assessment the following factors:

> (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; and (5) the extent to which such conduct offends a public sense of justice and propriety.

*Alamo Nat'l Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex.1981). When reviewing a punitive-damage verdict for excessiveness, we must detail the relevant evidence and explain why, in light of the *Kraus* factors, the evidence either supports or does not support the punitive-damage award. *Ellis County State Bank v. Keever,* 888 S.W.2d 790, 798 (Tex. 1994); *Moriel,* 879 S.W.2d at 31. We have detailed the evidence previously.

We believe the retaliation shown by the evidence is precisely the kind of wrongdoing that punitive damages were meant to punish and deter. We refer first to the character of the conduct and its effect upon the public sense of justice and propriety. The retaliation against Heim and the practice of "professional courtesy"—a self-serving neglect to enforce the law impartially as shown in the evidence—are particularly repugnant in this respect. The public trusts police officers unquestioningly because of their sworn duty to uphold the law and enforce it impartially, their stern and often dangerous duties, the reports of their not infrequent heroism, and prudence discretion with which they ordinarily exercise the awesome discretionary powers vested in them as peace officers to secure public safety and order. Police misconduct fractures that trust.

Concerning Heim individually, the evidence permitted the jury to believe that supervising officers wrongfully used their powers to coerce Heim to violate his sworn duties and to injure him in his most intimate interests: his safety, his family, and his career. Selective enforcement of Department regulations resulted in complaints,

official" as used in *Gladewater* has the potential to encompass a wide array of city employees to which an authority to act is delegated. *See City*

*of San Antonio v. Rodriguez,* 856 S.W.2d 552, 562 (Tex.App.—San Antonio 1993, writ denied).

investigations, and disciplinary suspensions that appear on his permanent employment record. Lower-level officers, in addition to bullying Heim regularly, exposed him to danger by refusing to provide him with back-up assistance. Evidence was given that the retaliation was pervasive. The jury could reasonably believe the acts of retaliation were condoned by the Department. We will discuss further, in relation to mental-anguish damages, the situation and sensibilities of the parties involved.

The City emphasizes evidence in the record showing that Chief Gibson did not encourage or participate in the retaliation. At trial, Chief Gibson testified that he always treated Heim fairly when imposing suspensions and that he would not condone retaliation by members of the Department. The evidence shows that on a few occasions Chief Gibson indeed reduced the number of days of suspension recommended by IA. In addition, officers testified that Chief Gibson did not affirmatively suggest that they discriminate against Heim. The jurors were nevertheless free to discount this evidence of silence and conclude that Chief Gibson participated in the retaliation tacitly by condoning the numerous acts of retaliation shown by the evidence and brought to his attention without effect. The credibility of witnesses and the meaning and weight proper to be assigned their testimony were, of course, for the jury to determine.

We conclude in light of the *Kraus* factors that we may not set aside the sum awarded here as punitive damages on the ground that it is disproportionate to the severity of the wrongs and not reasonably related to the objectives of punishment and deterrence underlying such awards. We overrule point of error six.

## MENTAL–ANGUISH DAMAGES

 In point of error seven, the City contends the jury awards of $250,000 for past mental anguish and $250,000 for future men-

tal anguish are excessive and not justified by the evidence.[14] A plaintiff may establish the fact of mental anguish by direct evidence of the nature, duration, or severity of suffering that resulted in a substantial disruption of his daily routine. *Woodruff,* 901 S.W.2d at 444. Absent such direct evidence, to prove mental anguish a plaintiff must show a high degree of mental pain and distress that is more than mere worry, anxiety, anger, vexation, or embarrassment. *Id.*; *Kneuper,* 768 S.W.2d at 460.

We hold the evidence is legally and factually sufficient to satisfy these tests. Heim testified that the continuing episodes of retaliation adversely affected his enthusiasm and ability to do his job. Although he very much enjoyed police work, he was forced to remain away from work (by using several hundred hours of his compensatory time) because of his fear of retaliation by Sergeant Jacobs and others. Heim's deteriorating working conditions caused him continuous distress while at work; for example, he was forced to check his automobile regularly out of fear that other officers might have planted contraband there.

The jury could reasonably conclude that the numerous suspensions Heim received not only resulted in injury to his reputation and career as a law-enforcement officer but also caused Heim to suffer public and private humiliation. Heim's suspensions, for example, prevented his training junior officers in the field; as a result, he believed that in the eyes of others he had "nothing to offer" as a career police officer.

Most importantly, the evidence showed that Heim feared regularly for his physical safety, as when other officers refused to respond to his requests for back-up assistance. Heim stated he could no longer do his job properly because he feared "what might happen to [him] on the street from other officers or other supervisors who were supposed to support [him]." He testified:

**14.** In regard to this point of error, the City argues that the mental anguish Heim suffered must result from the actions of Chief Gibson. The argument fails to recognize that mental anguish damages are based, after an initial finding of the defendant's liability, on the type and severity of

the plaintiff's suffering. *See Parkway v. Woodruff,* 901 S.W.2d 434, 444 (Tex.1995). We have previously discussed, in our disposition of points of error three through five, the issue of institutional retaliation. *See also Green,* 855 S.W.2d at 143.

[I] can't count on the people that are supposed to be here to support me.... I have much less fear of people on the street than I have of some of the police officers that I work with and around. The only thing worse than having a bunch of crooks after you if you are a policeman is having a bunch of cops after you, in my opinion, because they have the means and the methods and the ways to get back at you.

Heim gave in evidence his opinions as follows: his unjustified reputation as a troublemaker will affect adversely his ability to continue his career as a police officer or to pursue work in related fields; although the discrimination abated with his filing the present lawsuit, it will resume and intensify with the conclusion of the suit resulting in even greater danger to himself than in the past; and the resulting fear, worry, and anxiety will prevent his lasting even five more years of the twenty-five or thirty years he intended to serve on the force before the discrimination began.

There is in the evidence nothing to contradict the foregoing evidence. Instead, the Department's theory of the evidence and the case was that the discrimination found by the jury simply *never occurred.*

Jurors are best positioned to determine from their own experience the extent to which a defendant's conduct caused compensable mental anguish. *Kneuper,* 768 S.W.2d at 460. Heim described the nature and severity of the mental anguish he suffered. The evidence of threats against Heim's physical safety as well as injury to his career and reputation are sufficient qualifying events to support an inference that Heim suffered and will in reasonable probability continue to suffer mental anguish as a result of the retaliation. *See Woodruff,* 901 S.W.2d at 445; *see also Hart,* 892 S.W.2d at 927. The jury were not required to reject the details, credibility, and force of Heim's testimony; they were free to believe his testimony, corroborated by other witnesses, and assign it the weight reflected in their verdict. For these reasons, we cannot hold the sums found by the jury for past and future mental anguish are excessive. *See Pope v. Moore,* 711 S.W.2d 622, 624 (Tex.1986). We overrule point of error seven.

We affirm the trial-court judgment.