TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-96-00510-CV






Lubbock County, Texas, Appellant



v.



Karen K. Strube, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT


NO. 94-08639, HONORABLE JOSEPH H. HART, JUDGE PRESIDING 







 Karen Strube sued Lubbock County, her employer, alleging retaliatory discrimination and
retaliatory termination in violation of the Whistleblower Act. (1) The trial court rendered judgment on a jury
verdict, awarding Strube $630,000 in actual damages, $1,250,000 in exemplary damages, and 40% of
total damages as reasonable attorneys' fees. The County appeals. We will reverse and render the
judgment in part, sever and remand a portion for further proceedings, and affirm the remainder of the trial
court's judgment.


PROCEDURAL BACKGROUND


 In 1994, Strube sued Lubbock County contending she was wrongfully suspended for ten
days without pay and wrongfully placed on probation for a year. The sheriff's department said she was
disciplined for engaging in horseplay with other employees; Strube alleges the discipline was in fact
retaliation for her report to the Texas Department of Health that the sheriff's department improperly used
certain chemical cleaners. There were several other incidents, and the sheriff's department terminated
Strube's employment in 1995. After exhausting her administrative remedies, Strube brought this
Whistleblower cause of action. The jury found that: (1) the County retaliated against Strube for reporting
conditions she believed to be violations of law to the Texas Department of Health; (2) she suffered damages
of $20,000 for lost wages, $260,000 for loss of future earning capacity, $300,000 for past mental anguish,
and $50,000 for future mental anguish; (3) the County acted with malice in its retaliation; and (4) Strube's
reasonable attorneys' fees, stated as a percentage of damages, were 40%. In a bifurcated proceeding,
based upon the finding of retaliation with malice, the jury also determined that the County was liable for
exemplary damages in the amount of $1,250,000. The trial court rendered judgment on the jury verdict
in favor of Strube. 

 In five points of error, the County challenges the legal and factual sufficiency of the evidence
supporting the jury findings of retaliation, future mental anguish, attorneys' fees, and malice, and contends
the trial court erred by allowing Strube's expert on loss of future earning capacity to testify contrary to his
report submitted during discovery.


FACTUAL BACKGROUND


 In 1988, Strube began her employment as a Lubbock County jailer serving under Sheriff
Sonny Keesee. Strube completed a two-week course at jail school and a two-week training period before
becoming an officer. Generally, she worked the night shift. Strube was a good officer and her employment
as a jailer was unremarkable until February 1994. 


The cleaning assignment

 In February 1994, Lieutenant Dumas gave Strube a cleaning assignment that required her
to use some new cleaning products that were highly corrosive. The County provided no training or safety
equipment to protect against the dangerous chemicals. When Strube applied the cleaners to a day-room
table, white fumes filled the room, causing her respiratory problems and making her eyes water. 
Additionally, Strube noticed a burning sensation on her hands, legs, and feet, all areas directly exposed to
the cleaners. Later, blisters appeared on Strube's face, hands, and feet. 


Strube complains

 When Strube reported to work for her next shift, she showed the blisters to her immediate
supervisor, Sergeant Gentry, who dismissed her complaint, saying she was always fussing about something. 
Next, Strube complained about the cleaning products to Lieutenant Dumas, who responded, "[W]hatever
the front office wants is what we're going to do. So quit your bitching and just go back to work." Neither
Sergeant Gentry nor Lieutenant Dumas suggested that Strube report her injuries.

Strube's report

 When her supervisors dismissed her complaints, Strube took matters into her own hands;
she retrieved the empty containers from the trash. The labels warned that the cleaners were extremely
corrosive and should only be used with protective equipment. To document her concerns, Strube removed
the warning, "because they're making us use this stuff without telling us about the dangers that are involved
with it or providing us with any protective gear." On her way home, Strube stopped at her father's house
and showed him her blisters and the warning. Her father called the Texas Department of Health, the state
agency responsible for enforcing the Texas Hazard Communications Act. See Tex. Health & Safety Code
Ann. §§ 502.001, .012 (West 1992). 

 Strube discussed her use of the cleaning products with Perry Williams, an inspector at the
Department of Health. Williams told Strube that he would investigate the County's use of the cleaners and
assured her the report would be confidential. A few days after Strube spoke with Williams, he met with
the county judge and the sheriff. Williams inspected the jail and proposed a fine unless the safety violations
were corrected. Williams refused to disclose the name of the complainant.

 Strube also told the union lawyer, Floyd Holder, about the blisters she received from the
cleaning products. In a letter to the County, Holder identified Strube as his client and asked the County
to provide its employees with protective gear. Don Addington, the jail administrator, commented, "I guess
when all this is over that we're going to have to fire her." One of Strube's fellow officers thanked her for
contacting the Department of Health. Strube was alarmed and said she did not want anyone to know she
made the report; the other officer said everyone already knew. Strube became more alarmed when Sheriff
Keesee telephoned her at home to discuss the complaint to the Department of Health and to question her
loyalty. When Strube asked if she would get in trouble for her actions, the sheriff assured her, "[t]here
won't be any retaliation taken against you. Just next time come talk to me." The next night, Sergeant
Gentry again relayed the sheriff's assurances that there would be no retaliation against her for the report. 
Strube testified that this merely raised her suspicions.

 After the sheriff called Strube at home, Captain Holcomb asked her to complete an injury
report. Both Strube and her fellow officers sensed that senior officials in the sheriff's department were
upset with her. Lieutenant Dumas uncharacteristically refused to let Strube off work at 7:00 a.m. to pick
up her son. When he finally let her off an hour late, Dumas said mysteriously, "Oh, well. Couldn't help it,
could we?" Strube also noticed she was no longer given voluntary overtime opportunities. On the other
hand, Lieutenant Dumas required her to work overtime on her son's birthday and did not allow her any
time off when her daughter was hospitalized. When Strube suffered a shoulder injury, her doctor
prescribed that she do only light duty work for four weeks; nevertheless, Lieutenant Dumas denied her
request for a light duty assignment and Captain Holcomb rejected Strube's appeal from this decision.


The slapping incident

 In May 1994, several officers were teasing Sergeant Yeates because he drew a "whiner"
as his partner in the department's golf tournament. In jest, Strube and others dared Yeates to slap the
partner if he started whining during the game. Yeates decided to feign a slap to the whiner but accidentally
struck him on the face. The unintended victim reported the incident. At the disciplinary proceeding
against Yeates, Chief Bartley threatened to file conspiracy charges against Strube as well. Chief Bartley
also threatened to ruin Strube's career and family by making sure she went to prison if the officer filed
charges. Strube became very upset and told Chief Bartley she would accept any punishment because she
did not want to go to prison. The disciplinary board suspended Strube for ten days and placed her on
probation for one year; it also sanctioned Yeates and placed him on probation for one year. None of the
other officers engaged in this incident were punished. 

 Strube complained to Sheriff Keesee about the suspension. He replied that "examples had
to be set to show others that that kind of conduct would not be tolerated in his jail." He instructed her to
conduct herself as a professional and to avoid embarrassing the department when she returned to work. 
As she was leaving his office, the sheriff gave Strube a pamphlet discussing inmates' privileges in Texas
prisons and suggested that she think about the pamphlet while she was on suspension.


Strube returns to work

 When Strube returned to work, she was assigned for four months to a remote area of the
jail to guard sex offenders, known to routinely taunt female jailers. Typically when a jailer reported such
behavior, the inmates were disciplined; however, none of Strube's hecklers received any disciplinary action. 

 In July 1994, two months after the disciplinary hearing, Strube sued the County alleging that
the slapping incident had been merely a pretext when in truth she had been disciplined in retaliation for her
report to the Department of Health. 


Second disciplinary hearing

 In January 1995, the department reduced Sergeant Yeates' probationary sentence to six
months, resulting in early completion; Strube testified that her request for the same reduction was denied. 
A few weeks later, she received notice from Captain Metsgar of a disciplinary hearing scheduled for
February 17, 1995. The notice averred that Strube failed to obey orders, performed her work improperly
and carelessly, and implied that she had violated department rules by filing a lawsuit against the County
without first notifying Sheriff Keesee. The day before the scheduled hearing, Strube received a cancellation
notice informing her that Sheriff Keesee had assigned Chief Bartley and Assistant Jail Administrator
Gutierrez to investigate her violations. This was contrary to department policy, which normally assigned
such investigations to the shift captain of the accused. 

 Strube soon received a second notice of a disciplinary hearing from Bartley and Gutierrez. 
This notice generally alleged a violation concerning the movement of inmates. Strube's request for more
information regarding the allegation was denied. Strube appeared at the disciplinary hearing before a board
of seven officers of various rank in the sheriff's department. She learned that an inmate, who was a friend
of the sheriff's, had accused her of providing the inmate with unauthorized medications. The inmate also
complained about Strube's failure to correctly type a poem composed by the inmate. Chief Bartley
videotaped the inmate's accusations although he conceded they were not serious. The inmate related an
incident concerning the "chain," the process of transferring inmates to state prison. It was department
policy to keep inmate movement secret to protect officers and inmates from potential violence. On
February 7, the inmate suspected that a "chain" was going out and repeatedly asked Strube if she was
going on the chain. After repeated badgering, Strube answered, "If you think you're on the chain, pack
your bags because I don't care if you're on the chain or not." Evidence showed that, without being
charged with a breach of security, officers routinely told inmates to pack their bags if they thought they were
on the next chain. But, for violating this rule, Strube was terminated.


 DISCUSSION


Jury's Finding of Retaliation

 By point of error one, the County contends the evidence is legally and factually insufficient
to support the jury's finding that the County retaliated against Strube because of her report to the
Department of Health. 

 The Whistleblower Act provides for the recovery of damages and other relief when a
governmental entity discriminates against a public employee who in good faith reports a violation of law to
an appropriate law enforcement authority. Tex. Gov't Code Ann. §§ 554.002, .003 (West 1994). A
causal link between the report and the employer's prohibited conduct is presumed if the employer's action
occurs within 90 days of the employee's report. Id. § 554.004. If the employer's action occurs later than
this, the employee must prove a causal link but does not have to prove that reporting the illegal conduct was
the sole reason for the employer's adverse action. Texas Dep't Of Human Servs. v. Hinds, 904 S.W.2d
629, 634 (Tex. 1995). "[T]he employee's protected conduct must be such that, without it, the employer's
prohibited conduct would not have occurred when it did. Id. at 633; Texas Natural Resource Conserv.
Comm'n v. McDill, 914 S.W.2d 718, 722 (Tex. App.--Austin 1996, no writ). The Hinds causation test
has been described as a "but for" causal nexus requirement. McDill, 914 S.W.2d at 723. 

 The jury was asked "[D]id Lubbock County retaliate against Karen Strube for reporting
to the Texas Department of Health conditions that she in good faith believed were violations of the law?" 
The court instructed the jury that "retaliation" includes discrimination or termination of employment and
"good faith" means (a) "that Karen Strube believed the conditions she reported were a violation of law and
(b) that her belief was reasonable in light of her training and experience." The County did not object to this
submission. 

 When deciding a legal-sufficiency point, the appellate court considers only the evidence
and inferences tending to support the jury findings, disregards all evidence and inferences to the contrary,
and reverses only if no evidence supports the findings. Alm v. Aluminum Co. of Amer., 717 S.W.2d 588,
593 (Tex. 1986), cert. denied, 498 U.S. 847 (1990); Wichita County v. Hart, 892 S.W.2d 912, 923
(Tex. App.--Austin 1994), rev'd on other grounds, 917 S.W.2d 779 (Tex. 1996). When deciding a
factual-sufficiency point, the appellate court considers all of the evidence and sets aside a finding only if it
is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Cain v. Bain,
709 S.W.2d 175, 176 (Tex. 1986); Hart, 892 S.W.2d at 923. The jury's finding must be upheld unless
it is so against the great weight and preponderance of the evidence as to be manifestly unjust or erroneous. 
Pool v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986). We are not free to substitute our judgment
for the jury's simply because we may disagree with the verdict. Herbert v. Herbert, 754 S.W.2d 141,
142 (Tex. 1988). 

 Often in employment discrimination cases, there is no direct evidence. Casteneda v.
Texas Dep't of Agriculture, 831 S.W.2d 501, 505 (Tex. App.--Corpus Christi 1992, writ denied). 
Indeed, a series of acts by an employer can sufficiently raise inferences to overcome legal and factual
sufficiency challenges. Texas Dep't of Human Servs. v. Green, 855 S.W.2d 136, 146 (Tex.
App.--Austin 1993, writ denied). Additionally, a jury is free to believe or disbelieve any part of the
evidence in making its finding. McGalliard v. Kuhlmann, 722 S.W.2d 694, 697 (Tex. 1986); Hart, 892
S.W.2d at 926. 

 We hold the evidence is both legally and factually sufficient to support the jury's finding that
the retaliation would not have occurred but for Strube's report to the Department of Health. Almost
immediately after the report, Strube's supervisors began treating her negatively. There was testimony that
the jail administrator said the department was going to fire Strube "when this is all over." The sheriff called
Strube at home and questioned her loyalty. Before her report, Strube was scheduled for voluntary
overtime; after the report she was denied any voluntary overtime. Strube was assigned to the sex offender
unit for several months and her complaints about the inmates' actions went unanswered. Her supervisors
denied her scheduling relief when her child was hospitalized following an emergency. We conclude that
there is some evidence to support the jury's finding and that the finding is not so against the great weight
and preponderance of the evidence as to be unjust. We overrule point of error one.


Expert Testimony on Loss of Earning Capacity

 In point of error two, the County contends the trial court erred by allowing Strube's
accounting expert, Jonathan Kemmerer, to testify differently from his report produced during discovery
regarding Strube's loss of future earning capacity. The County argues the trial court should have excluded
Kemmerer's testimony to the extent it differed from the report. Tex. R. Civ. P. 166b(6)(a), (b) & 215(5);
see Mentis v. Barnard, 870 S.W.2d 14, 16 (Tex. 1994); Alvarado v. Farah Mfg. Co., 830 S.W.2d
911, 915 (Tex. 1992).

 In his report furnished during discovery, Kemmerer stated that he used the "human capital"
or "lost economic output" approach for calculating Strube's future losses due to diminished earning
capacity. This method takes the plaintiff's annual salary at the lost job and deducts a percentage based on
the amount of diminished earning capacity found by the jury. The loss is calculated over the number of
future years the plaintiff is expected to work; the figures for future years are increased to account for
inflation and reduced by a "discount factor" to account for the present value of money.

 Kemmerer's pretrial report estimated losses of $21,473 if the jury found Strube suffered
a ten percent loss in earning capacity and $53,683 for a twenty-five percent loss. The figures were based
on ten years of future employment and a discount factor of seven percent. On the morning of trial, Strube's
attorney furnished the County's attorney with a new report from which Kemmerer testified at trial. At trial
Kemmerer gave figures of $258,704 and $517,407 for fifty percent and one hundred percent losses,
respectively. These figures were based on twenty-five years of future employment and a five percent
discount factor. 

 After Kemmerer's direct examination, the County objected to the testimony on the ground
that it had not received the new report at least thirty days prior to trial and that Kemmerer's testimony
reflected significant changes in the basic assumptions of his methodology. The County referred to an
objection made at the bench when it received the new report, but that objection is not on the record as
required by Texas Rule of Evidence 103. The County never moved to strike Kemmerer's testimony. The
County did not timely object to Kemmerer's testimony and thus waived any complaint on appeal. See Tex.
R. App. P. 52(a); Tex. R. Civ. Evid. 103(a).

 Even if the County had timely objected, we would conclude that the trial court properly
admitted the testimony. Admitting and excluding evidence are matters within the trial court's discretion.
Green, 855 S.W.2d at 149; Tracy's v. Annie's Attic, Inc., 840 S.W.2d 527, 531 (Tex. App.--Tyler
1992, writ denied). To obtain reversal of a judgment based on error in the admission or exclusion of
evidence, an appellant must show that the trial court's ruling was in error and that the error was calculated
to cause and probably did cause rendition of an improper judgment. Exxon Corp. v. West Texas
Gathering Co., 868 S.W.2d 299, 303 (Tex. 1993); Gee v. Liberty Mut. Fire Ins. Co., 765 S.W.2d
394, 396 (Tex. 1989); Tex. R. App. P. 81(b)(1). 

 Although the County's objection was late, the trial court dismissed the jury and held a
hearing on whether to admit the testimony. The trial court determined there was no difference in the
methodology Kemmerer used to reach the pretrial numbers and the numbers given at trial. In Exxon
Corp., 868 S.W.2d at 304, the supreme court affirmed the trial court's admission of expert testimony
where the proponent presented new calculations to the opposing party five days before trial, because the
method used would lead to substantially the same results as the method presented during discovery. In this
case, Kemmerer used the same formula but provided figures based on jury findings of fifty and one hundred
percent diminished earning capacity. Kemmerer told the trial court that he did not provide figures earlier
at these levels because Strube's attorney only requested those scenarios the day before. Kemmerer told
the jury that a reasonable range for the discount factor was from four to nine percent, and that he chose
to use five percent because he considered it to be a conservative, reasonable amount. Although the pretrial
report calculated losses based on only ten years of future employment, the County could have anticipated
that Kemmerer would use a more realistic number for a thirty-five-year-old woman. The rules of discovery
do not prevent experts from refining calculations and perfecting reports through the time of trial. Exxon
Corp., 868 S.W.2d at 304. Kemmerer did not make the kinds of fundamental alterations that would
constitute a surprise attack on the opposing side. See id. at 305. The report furnished during discovery
provided the County with his methodology and hypothetical calculations such that the County could prepare
to attack his testimony on cross examination whatever the level of diminished earning capacity. We
conclude the trial court did not abuse its discretion by admitting Kemmerer's testimony.

 Under the same point of error, the County contends that even if Kemmerer's testimony was
properly admitted, the evidence is legally and factually insufficient to support the finding of reduced future
earning capacity. Kemmerer did not testify that impairment of earning capacity actually existed. Rather,
he only estimated Strube's lifetime wages at various levels of impairment, should impairment exist. The
County contends the jury was left to impermissibly speculate about Strube's loss of future earning capacity. 
See Bonney v. San Antonio Transit Co., 325 S.W.2d 117, 121 (Tex. 1959). The jury apparently
concluded that Strube's earning capacity was diminished by fifty percent because it awarded Strube
$260,000 for loss of future wages.

 The Whistleblower statute does not specify the measure of damages for future losses. Tex.
Gov't Code Ann. § 554.003 (West 1994); Hart, 892 S.W.2d at 924. While loss of future earning
capacity is not the only measure, it is a measure recognized in a variety of cases. Id.; City of Ingleside v.
Kneuper, 768 S.W.2d 451, 454 (Tex. App.--Austin 1989, writ denied). Additionally, proof of lost
wages is evidence of loss of future earning capacity. Hart, 892 S.W.2d at 925 n.14. 

 At trial, Strube offered evidence of the wages she previously earned as compared to her
current wages. As an officer with the sheriff's department, she made $26,000 per year plus benefits. As
a nurse's aide, her salary dropped to $12,000 per year without benefits, a somewhat greater than fifty
percent loss in earning capacity. Her termination from the sheriff's department could be seen as ending her
law enforcement career at the higher salary level. The evidence provided a basis on which the jury could
infer a level of diminished earning capacity. We conclude the jury's finding is not so against the great weight
and preponderance of the evidence as to render the judgment unjust. We overrule point of error two.



Future Mental Anguish

 By point of error three, the County contends the evidence is legally and factually insufficient
to support the jury's finding that Strube will suffer future mental anguish damages in the sum of $50,000. 
The County does not challenge the jury's finding that Strube suffered past mental anguish damages in the
sum of $300,000. The jury was instructed that 


"mental anguish" implies a relatively high degree of mental pain and distress. It is more than
mere disappointment, anger, resentment or embarrassment, although it may include all of
these. It includes a mental sensation of pain resulting from painful emotions such as grief,
severe disappointment, indignation, wounded pride, shame, despair, and/or public
humiliation. 



 Damages for future mental anguish are recoverable "if there is a reasonable probability that
they will be suffered in the future." Hicks v. Ricardo, 834 S.W.2d 587, 590 (Tex. App.--Houston [1st
Dist.] 1992, no writ). Mental anguish damages may not be awarded without either "direct evidence of the
nature, duration, or severity of [plaintiff's] anguish, thus establishing a substantial disruption in the plaintiff's
daily routine," or other evidence of "'a high degree of mental pain and distress' that is 'more than mere
worry, anxiety, vexation, embarrassment, or anger.'" Saenz v. Fidelity & Guar. Ins. Co., 925 S.W.2d
607, 614 (Tex. 1996) (quoting Parkway Co. v. Woodruff, 901 S.W.2d 434, 444 (Tex. 1995)). 

 The only evidence in the record concerning future mental anguish was Strube's statement
that after she was fired she became depressed and withdrew "into a shell." She stated that her depression
lasted approximately four months. She then explained that "with the help of my family and my friends, I
just realized that being fired from the sheriff's department wasn't the end of the world." The County
contends the jury disregarded this testimony in finding that she should be compensated for continuing mental
anguish.

 Strube responds the evidence shows a reasonable probability that her past mental anguish
will continue because her career loss continues in the future. Additionally, Strube argues the evidence
supporting the unchallenged jury finding of $300,000 for past mental anguish logically permits the inference
that the mental anguish will continue. 

 The record lacks any direct evidence that Strube's mental anguish will continue in the
future. In fact, her testimony reflects just the opposite--although for four months she experienced much
mental anguish, with the help of family and friends she realized that being fired was not the end of her life. 
We have searched the record and found no evidence that Strube would continue to suffer mental anguish
in the future. We accordingly sustain the County's third point of error, reverse the trial court's award of
future mental anguish damages in the sum of $50,000, and render that Strube take nothing in that regard. 



Attorneys' Fees

 By point of error four, the County contends the award of attorneys' fees as 40% of
Strube's total damages is not supported by the evidence. Strube was awarded $752,000 in attorneys' fees
based on this percentage.

 Broadus Spivey testified as an expert for Strube on attorneys' fees. In his opinion, a 40%
contingency fee was reasonable for this case. Spivey stated on cross-examination that it would be
inappropriate to "stack" attorneys' fees on top of the damages. The County seizes upon this statement as
evidence that the attorneys' fees here should be deducted from Strube's damages recovery, not stacked
on top of it. We note that the expert's opinion testimony was not probative of the pure question of law
whether an award of attorneys' fees should be added to or deducted from the plaintiff's recovery. See
Lyondell Petrochemical Co. v. Flour Daniel, Inc., 888 S.W.2d 547, 554 (Tex. App.--Houston [1st
Dist.] 1994, writ denied).

 While a contingency fee may be deducted from the recovery absent statutory award of
attorneys' fees, such is not the case under this act. The Whistleblower Act provides that a public employee
may recover reasonable attorneys' fees in addition to other damages and costs. Tex. Gov't Code Ann.
§ 554.003(a)(5) (West 1994) (emphasis added). The language of similar statutes supports the award of
attorneys' fees in addition to damages. The Deceptive Trade Practices Act allows a prevailing consumer
to recover "reasonable and necessary attorneys' fees." Tex. Bus. & Com. Code Ann. § 17.50(d) (West
1987 & Supp. 1997). This allows the winning plaintiff to recover the full amount of damages suffered
rather than bear the burden of reasonable costs incurred in prosecuting the defendant for the deceptive act. 
Berry Property Management Inc. v. Bliskey, 850 S.W.2d 644, 670-71 (Tex. App.--Corpus Christi
1993, writ dism'd by agr.). We hold that Strube is entitled to recover reasonable attorneys' fees in addition
to her damages.

 The County also contends the evidence does not support the award of attorneys' fees. The
jury was asked to determine a reasonable fee for the necessary services of Strube's attorneys by stating
a percentage. Recently, in Arthur Andersen & Co. v. Perry Equipment Corp., 945 S.W.2d 812 (Tex.
1997), the supreme court held that a plaintiff can no longer simply ask a jury to award a percentage of the
damages as attorneys' fees. Id. at 819. Although a party's contingency fee agreement may be considered
by the factfinder, it alone provides the jury with no meaningful way to determine if the actual amount of
attorneys' fees was in fact reasonable and necessary. Id. The plaintiff must prove the fees were both
reasonably and necessarily incurred in the prosecution of the case and ask the jury for a specific dollar
amount. Id. In reaching the dollar amount, the factfinder must consider the following factors:


(1)  the time and labor required, the novelty and difficulty of the questions involved, and
the skill required to perform the legal service properly;


(2)  the likelihood . . . that the acceptance of the particular employment will preclude other
employment by the lawyer;


(3)  the fee customarily charged in the locality for similar legal services;


(4)  the amount involved and the results obtained;


(5)  the time limitations imposed by the client or by the circumstances;


(6)  the nature and length of the professional relationship with the client;


(7)  the experience, reputation, and ability of the lawyer or lawyers performing the services;


(8)  whether the fee is fixed or contingent on results obtained or uncertainty of collection
before the legal services have been rendered. 



Id. at 595 (quoting Tex. Disciplinary R. Prof. Conduct 1.04, reprinted in Tex. Gov't Code Ann., tit. 2,
subtit.G app. (State Bar Rules, art. X, § 9)). 

 Strube contends the County waived error in the submission of attorneys' fees by not
objecting to the failure to ask the jury for a specific dollar amount. Counsel stated:

There is no evidence from [Spivey] that would justify the submission of the question asking
the jury to determine a percentage of attorney's fees to be added to the recovery of the
Plaintiff in this case, and we would object to the submission of that charge--of that
particular question at all. 



We note that at the time of this trial the supreme court had not yet issued its opinion in Perry Equipment. 
Until recently, evidence of a contingency fee agreement would have supported an award of attorneys' fees
under the Whistleblower Act. Texas Animal Health Comm'n v. Miller, 850 S.W.2d 254, 257 (Tex.
App.--Eastland 1993, writ denied). However, when the applicable law changes during the pendency of
an appeal, a court of appeals must render its decision in light of the change in the law. Blair v. Fletcher,
849 S.W.2d 344, 345 (Tex. 1993). Generally, a decision of the supreme court operates retroactively
unless the court exercises its discretion to provide otherwise. Bowen v. Aetna Casualty & Sur. Co., 837
S.W.2d 99, 100 (Tex. 1992). Taking into account the fact that the County did not have Perry Equipment
before it, we conclude the County's objection adequately preserved error. Because there was insufficient
evidence for the jury to determine whether the amount was reasonable and necessary, we reverse the
award of attorneys' fees. We are authorized to sever the claim and reverse and remand only the award
of attorneys' fees. ASAI Corp. v. Vanco Insulation Abatement, Inc., 932 S.W.2d 118, 124 (Tex.
App.--El Paso 1996, no writ). We sustain the County's fourth point of error. 


Exemplary Damages

 By point of error five, the County contends the evidence is legally and factually insufficient
to support the finding of malice necessary to award exemplary damages. City of San Antonio v. Heim,
932 S.W.2d 287, 293 (Tex. App.--Austin 1996, no writ) (citing Kneuper, 768 S.W.2d at 457). The jury
charge defined "malice" as 


either conduct specifically intended to cause Strube substantial injury or an act carried out
with blatant disregard for her rights and actual awareness that the act would, in reasonable
probability, result in harm to her. 



The County did not object to the submission of the exemplary damages question or the submitted definition
of malice.

 The supreme court recently discussed the level of proof required to support an award of
punitive damages in a suit under the Texas Anti-Retaliation law. See Continental Coffee Prods. v.
Cazarez, 937 S.W.2d 444 (Tex. 1996). In holding that the employee must prove the employer acted with
actual malice, as opposed to malice implied from the employer's wrongful or intentional conduct, the court
stated:


We recognize that an employer's violation of [the anti-retaliation law] is an unlawful and
wrongful act. Yet, in most types of cases, "the fact that an act is unlawful is not of itself
ground for an award of exemplary or punitive damages. The act complained of not only
must be unlawful but also must partake of a wanton and malicious nature, or, as sometimes
stated, somewhat of a criminal or wanton nature, and an act will not be deemed malicious,
and so warranting punitive damages, merely because it is unlawful or wrongful."



Id. at 454. The court found nothing in the anti-retaliation statute to indicate legislative intent that malice may
be implied from the employer's intentional wrongdoing, noting it provided only for "reasonable damages
incurred by the employee as a result of the violation." Id. at 453-54. By contrast, the 1993 version of the
Whistleblower Act applicable in this case explicitly provided for the recovery of exemplary damages. (2) In
Wichita County v. Hart, 892 S.W.2d 912 (Tex. App.--Austin 1994), rev'd on other grounds, 917
S.W.2d 779 (Tex. 1996), a suit also brought under the 1993 Whistleblower Act, we found sufficient
record evidence to support a jury finding that the employer acted with malice in terminating the employees. 
In Hart, the jury was instructed that malice is "ill will or evil motive, or such gross indifference to or reckless
disregard of the rights of others as will amount to a willful or wanton act."

 As noted, the County did not object to the submitted definition of malice. While the
definition did not include the terms "ill will" or "evil motive," it did require the jury to find intent to cause
substantial injury or a blatant disregard for Strube's rights, which we think goes beyond mere intentional
retaliation. In any event, the evidence in this case is stronger than in either Cazarez or Hart and would
support an award of punitive damages under the definition of actual malice set forth in Cazarez. The
evidence shows Strube's supervisors first ignored her injuries resulting from her use of the cleaning
products, called her a disloyal employee after she reported the incident to the Department of Health, then
began to treat her differently regarding her work assignments and scheduling in spite of legitimate health
concerns to herself and her family. The record further shows that the department treated the actual
perpetrating officer in the slapping incident more favorably than Strube when it shortened his probationary
period but not hers. Ultimately, the department terminated Strube's employment for an action routinely
considered to be acceptable behavior by officers. The jail administrator's comment that the department
was "going to have to fire her" when it was all over, along with Sheriff Keesee's telephone call to Strube
at home, demonstrate the department's intent to retaliate. The sheriff's assurances that no retaliation would
result could be interpreted as disguised threats. Additionally, Strube's notice of the disciplinary hearing that
resulted in her termination was broadly worded and vague; the department denied her request for more
information about the nature of the accusations and then presented the videotape of an inmate accusing
Strube of specific policy violations. From all of this evidence, the jury could find the sheriff's department
administration acted with ill will or evil motives when it retaliated against Strube. The jury could also find
the department acted in blatant disregard for her rights and was aware that terminating Strube's
employment would result in her being unemployed and a negative mark on her employment record in the
law enforcement profession. We conclude that the evidence is legally and factually sufficient to support the
jury's finding of malice. 

 The County alternatively urges us to order a remittitur lowering the $1,250,000 in
exemplary damages to a reasonable amount. Although the County failed to adequately brief this argument,
we nevertheless will address this contention. See Tex. R. App. P. 74(f). 

 An appellate court reviews exemplary damages awards to ensure that they are reasonable
in their amount and rational in light of their purpose to punish malicious conduct and deter its repetition. 
Heim, 932 S.W.2d at 294. We may reverse an exemplary damages award or suggest a remittitur only if
we determine that the evidence supporting the award is so factually insufficient or the verdict is so against
the great weight and preponderance of the evidence as to be manifestly unjust. Id. (citing Transportation
Ins. Co. v. Moriel, 879 S.W.2d 10, 30 (Tex. 1994)). In our assessment, we consider the following
factors:


(1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of
culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; and
(5) the extent to which such conduct offends a public sense of justice and propriety. 



Id. (citing Alamo Nat'l Bank v. Kraus, 616 S.W.2d 908, 910 (Tex. 1981)). When reviewing an
exemplary damages verdict for excessiveness, we must detail the relevant evidence and explain why, in light
of the Kraus factors, the evidence either supports or does not support the exemplary damages award. Id.
(citing Ellis County State Bank v. Keever, 888 S.W.2d 790, 798 (Tex. 1994)). We have detailed the
evidence previously. 

 We assess the nature of the wrong in light of the purposes underlying the Whistleblower
Act of 1) protecting public employees from retaliation by their employers for reporting violations of law in
good faith, and 2) securing in consequence lawful conduct on the part of those who direct and conduct the
affairs of public bodies. See Travis County v. Colunga, 753 S.W.2d 716, 718-19 (Tex. App.--Austin
1988, writ denied). Strube first attempted to alert her employers of the dangerous cleaning chemicals
before turning to the Department of Health. Her employers shunned her attempts and then retaliated
against her for pursuing a policy of safety in the workplace. After her report, several of Strube's superior
officers notably resented the incident, purposefully made her job more difficult and finally fired her for what
had been considered acceptable conduct. One officer threatened to ruin her life. Such behavior by this
public entity is offensive to a public sense of justice and propriety and is the type of conduct punitive
damages are meant to punish and deter. The jury found the County should pay an amount of punitive
damages near twice the amount of actual damages. We hold the jury did not award punitive damages in
such an amount as to be clearly wrong and unjust. Therefore, we decline to order a remittitur and overrule
the County's fifth point of error. 


CONCLUSION


 The judgment of the trial court awarding $50,000 in damages for future mental anguish is
reversed and rendered that Strube take nothing on that claim. We also reverse the portion of the judgment
regarding attorneys' fees and sever and remand it to the trial court for further proceedings consistent with
Arthur Andersen & Co. v. Perry Equipment Co. In all other respects, the judgment of the trial court is
affirmed. 



 

 Bea Ann Smith, Justice

Before Justices Aboussie, Kidd, and B. A. Smith

Reversed and Rendered in Part; Reversed and Remanded in Part; and Affirmed in Part

Filed: August 14, 1997

Publish
1. Because the 1995 amendments govern only conduct occurring after June 15, 1995, the 1993 version
of the Whistleblower Act applies in this case. See Act of May 4, 1993, 73rd Leg., R.S., ch. 268, § 1,
1993 Tex. Gen. Laws 583, 609-11, amended by Act of May 25, 1995, 74th Leg., R.S., ch. 721, 1995
Tex. Gen. Laws 3812, 3814. 
2. The 1995 amendments to the Act removed punitive damages from the types of available relief. Tex.
Gov't Code Ann. § 554.003 (West Supp. 1997).



 of their purpose to punish malicious conduct and deter its repetition. 
Heim, 932 S.W.2d at 294. We may reverse an exemplary damages award or suggest a remittitur only if
we determine that the evidence supporting the award is so factually insufficient or the verdict is so against
the great weight and preponderance of the evidence as to be manifestly unjust. Id. (citing Transportation
Ins. Co. v. Moriel, 879 S.W.2d 10, 30 (Tex. 1994)). In our assessment, we consider the following
factors:


(1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of
culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; and
(5) the extent to which such conduct offends a public sense of justice and propriety. 



Id. (citing Alamo Nat'l Bank v. Kraus, 616 S.W.2d 908, 910 (Tex. 1981)). When reviewing an
exemplary damages verdict for excessiveness, we must detail the relevant evidence and explain why, in light
of the Kraus factors, the evidence either supports or does not support the exemplary damages award. Id.
(citing Ellis County State Bank v. Keever, 888 S.W.2d 790, 798 (Tex. 1994)). We have detailed the
evidence previously. 

 We assess the nature of the wrong in light of the purposes underlying the Whistleblower
Act of 1) protecting public employees from retaliation by their employers for reporting violations of law in
good faith, and 2) securing in consequence lawful conduct on the part of those who direct and conduct the
affairs of public bodies. See Travis County v. Colunga, 753 S.W.2d 716, 718-19 (Tex. App.--Austin
1988, writ denied). Strube first attempted to alert her employers of the dangerous cleaning chemicals
before turning to the Department of Health. Her employers shunned her attempts and then retaliated
against her for pursuing a policy of safety in the workplace. After her report, several of Strube's superior
officers notably resented the incident, purposefully made her job more difficult and finally fired her for what
had been considered acceptable conduct. One officer threatened to ruin her life. Such behavior by this
public entity is offensive to a public sense of justice and propriety and is the type of conduct punitive
damages are meant to punish and deter. The jury found the County should pay an amount of punitive
damages near twice the amount of actual damages. We hold the jury did not award punitive damages in
such an amount as to be clearly wrong and unjust. Therefore, we decline to order a remittitur and overrule
the County's fifth point of error. 


CONCLUSION


 The judgment of the trial court awarding $50,000 in damages for future mental anguis