CITY OF FORT WORTH, Appellant,

v.

Julius D. ZIMLICH, Appellee.

No. 03–97–00475–CV.

Court of Appeals of Texas,
Austin.

Aug. 31, 1998.

Ann Clarke Snell, Madison Jechow, Bickerstaff, Heath, Smiley, Pollan, Kever & McDaniel, L.L.P., Austin, for Appellant.

Douglas W. Alexander, Austin, for Appellee.

Before POWERS, KIDD and B.A. SMITH, JJ.

POWERS, Justice.

Julius D. Zimlich sued the City of Fort Worth (the "City"), his employer, alleging retaliatory discrimination in violation of the Whistleblower Act.[1] The trial court rendered judgment on a jury verdict, awarding Zimlich $300,200 for lost earnings, $300,000 for mental anguish, and $1,500,000 in punitive damages. The City appeals. We will affirm the trial-court judgment.

## THE CONTROVERSY

Julius Zimlich, a certified peace officer, was employed as a deputy marshal in the warrants division of the City Marshal's Office. He had served as a peace officer for fourteen years, and in the Marshal's Office for four years. By all accounts he was likeable, knowledgeable, and experienced—an "up and coming" young officer. In his four years at the Marshal's Office he had good relationships with his supervisors and received excellent evaluations.

In May 1993, Zimlich and Ricky Estorga, a fellow deputy, were selected for positions in the City's newly created Solid Waste Environmental Enforcement Program ("S.W.E.E.P."). The position required working jointly with the Marshal's Office and the Code Enforcement Division ("CED") of the City to police illegal dumping. The program was created through a grant from the Texas Natural Resource Conservation Commission ("TNRCC").

S.W.E.E.P. increased the enforcement powers of the City's Code Enforcement Division. Before S.W.E.E.P., CED policed illegal dumping without the assistance of commissioned peace officers such as Zimlich and Estorga. The S.W.E.E.P. officers, unlike CED officials, were authorized to carry firearms, wear badges, and make arrests in performing their duties.[2] And the duties of S.W.E.E.P. officers were broader than those of CED officials. The S.W.E.E.P. officers

---

1. Because the 1995 amendments govern conduct occurring after June 15, 1995, the 1993 version of the Whistleblower Act applies in this case. *See* Act of May 4, 1993, 73d Leg., R.S., ch. 268, § 1, 1993 Tex. Gen. Laws 583, 609–11. (Tex. Gov't Code Ann. § 554.001–.009 (West 1994), since amended) ("Former Act").

2. The City enacted the S.W.E.E.P. program partly due to concerns about sending unarmed CED officials to remote locations at night.

were empowered to enforce state statutes and regulations as well as City ordinances pertaining to solid-waste disposal. CED officers, by contrast, were authorized to enforce *only* City ordinances; and their powers were restricted to issuing notices and citations.

As S.W.E.E.P. officers, Zimlich and Estorga answered to supervisory personnel in both the CED and the Marshal's Office, although the hierarchy was not well-defined and the chain of authority is not entirely clear. Zimlich's direct supervisor in CED was CED assistant director Juan Mejia; Zimlich also continued to report to Chief Deputy Jack Scott in the Marshal's Office.

Zimlich's transfer to S.W.E.E.P. involved no change in salary or benefits and therefore was not technically a "promotion" under the City's rules and regulations. However, both Zimlich and his fellow deputies viewed the transfer as a promotion for all practical purposes. S.W.E.E.P. officers were given new, specially equipped vehicles and were expected to utilize a full range of law-enforcement and investigative skills. A fellow deputy characterized Zimlich's transfer as a "plume in his cap" for career purposes.

Zimlich and Estorga were sent to Austin for special training with the TNRCC, the Attorney General's Office, and the Keep Texas Beautiful Program—specialized training not available to CED officials. When they returned to Fort Worth, they set up a "hot line" that allowed area residents to make anonymous telephone reports of illegal waste-disposal activities. When Zimlich or Estorga learned of an illegal site, they were permitted to investigate the circumstances as they saw fit.

In October 1993, the officers received a telephone call about an illegal disposal site being operated in a residential area of Fort Worth. Zimlich located the site by helicopter and photographed the area. He visited the site and concluded that it violated state statutes and regulations. The site was not an authorized disposal site and contained various materials Zimlich recognized as dangerous, such as asbestos, oil, and antifreeze. A stream ran through the property and it was located near a residential area, making disposal at the site even more hazardous.

Zimlich told Juan Mejia, assistant director of CED, that he was investigating the site. At this time, Zimlich knew the site address but not the name of the owner. In an unusual order, Mejia told Zimlich to report his finding to the Superintendent of CED, Rufino Mendoza. Mendoza told Zimlich to discuss the matter with the Director of City Services, Tom Davis.

As Director of City Services, Davis directed all CED operations and those of two other City departments. Zimlich visited with Davis and told him about the site. To Zimlich's surprise, Davis told Zimlich to stop his investigation because there was "nothing out there." The order placed Zimlich in a difficult and awkward position. On becoming a certified peace officer, Zimlich had taken an official oath to uphold the laws of the State and to pursue any violations he found. He had never before been required to report his investigations to higher officials; he and Estorga had previously conducted their investigations independently and at their discretion.

Zimlich approached Norman Donoho, head of the Marshal's Office, and told him that Davis and Mendoza were preventing Zimlich from investigating an illegal disposal site. Zimlich told Donoho he was considering reporting Davis and Mendoza to the Tarrant County District Attorney's Office for hindering a criminal investigation. Donoho told Zimlich he would look into the matter and that Zimlich should make whatever reports to appropriate authorities Zimlich felt were necessary. Zimlich and Estorga reported the illegal disposal site to the TNRCC, and Zimlich told the Texas Attorney General and the Tarrant County District Attorney's Office that Davis and Mendoza were obstructing a criminal investigation. Shortly after Zimlich reported the illegal site to the TNRCC, Davis sent a memo to Zimlich and Estorga ordering them not to seek assistance from outside agencies without CED permission.

The illegal disposal site belonged to Ted Peters, a former member of the Fort Worth City Council. The City had given Peters a permit to "fill" the land—which did not include permission to dump trash at the site—

but Peters apparently misunderstood the scope of the permit. Peters called Tom Davis after receiving a notice from CED that his property was in violation of waste-disposal laws. Davis met with Peters at the site during the lunch hour. Davis informed Peters that the site was not properly "permitted" and that Peters would have to cease dumping waste materials there. Davis ordered Peters to remove some of the waste and bury the rest. The meeting between Davis and Peters took place the same day Davis ordered Zimlich to stop his investigation because there was "nothing out there."

In February 1994, a reporter from a Fort Worth television station contacted Zimlich and Estorga about helping the reporter with a telecast series on illegal waste disposal in Tarrant County. The station wanted to do a feature on the S.W.E.E.P. program. Zimlich and Estorga cooperated. The resulting telecast reported the controversy surrounding the Peters site. On the program, Davis told viewers the City was taking no action to clean up the site because it was not dangerous. Zimlich publicly aired his opposing view that Davis and Mendoza were hindering a proper clean-up of the site.

After the telecast, Davis came under pressure from the City Council to explain his actions regarding the site. Davis prepared an explanatory report to the Mayor and members of the City Council. The report did not reveal the fact that it was composed by Davis himself; it purported instead to rest upon an independent investigation of the situation. The document was signed by Assistant City Manager Ramon Guajardo, over the signature block of City Manager Bob Terrell. Nothing in the report indicated who the author was.

The report to the City Council cleared Davis of any misconduct and portrayed Zimlich as an overzealous officer bent on "arresting" Ted Peters. More specifically, the report described the site as containing some tires and some inert materials "not considered an environmental threat." The report falsely stated "there was no evidence of ... barrels or other containers that might contain liquids," and made no mention of the stream running through the site or that the

site was near a residential area. The report related that Davis ordered the landowner to clean up the site by removing some materials and burying the rest. According to the report, *after* Davis had appropriately resolved the matter, a S.W.E.E.P. officer (Zimlich evidently) discovered the landfill and "informed the Director of City Services that he was making a case against the owner and was almost ready to arrest him."

The Peters site did in fact contain dangerous materials. By May 1994, the TNRCC, after receiving notification from Zimlich, had inspected the site. The inspection confirmed Zimlich's report of empty oil cans and antifreeze containers, as well as paint and solvent cans, and concluded the site was in violation of state criminal laws. The site was, indeed, near a church and residential area where children played. A stream ran through the property and it was located over a subsurface creek.

Moreover, Davis's directions to Peters did not bring the site in compliance with TNRCC requirements nor with the City's obligations under S.W.E.E.P. The S.W.E.E.P. contract with the State required individuals responsible for illegal dumping to remove and dispose of dumped materials, "leaving the property in the condition that existed prior to the illegal dumping." Davis's order that Peters bury the waste was itself illegal. After the TNRCC investigation, the Manager of the Compliance and Enforcement Section of the Municipal Solid Waste Division of the TNRCC ordered Peters to *remove* the waste from the site or face prosecution for criminal violations. Faced with the threat, Peters removed approximately 356 *tons* of illegal material from the site.

After the "Peters incident," Zimlich's career deteriorated. The City—at the recommendation of Tom Davis—decided not to renew the S.W.E.E.P. program. Zimlich received his first disciplinary actions in fourteen years of law-enforcement work. He was assigned to what fellow workers considered the lowest post at the Marshal's Office and denied promotions.

Zimlich sued the City for violation of the Whistleblower Act. A jury found the City had

retaliated against Zimlich for his actions in "the Peters incident," and returned a verdict against the City for $300,200 for future lost earnings, $300,000 for mental anguish, and $1,500,000 in punitive damages. The trial court rendered judgment on the verdict. The City brings eleven points of error.

## DISCUSSION AND HOLDINGS

The Whistleblower Act provides for the recovery of damages and other relief when a governmental entity discriminates against a public employee who in good faith reports a violation of law to an appropriate law enforcement authority. Former Act §§ 554.002, .003.[3]

*Discrimination*

In its first three points of error, the City challenges the sufficiency of the pleadings and the evidence to support a finding of liability against the City.

In its first point of error, the City contends there were no pleadings to support the jury finding that the City discriminated against Zimlich by "changing his job duties" or by "failing to promote him."

Zimlich's pleadings alleged different forms of discrimination than those ultimately submitted to the jury: he alleged that the City suspended him and reprimanded him in retaliation for his report, but did not allege a retaliatory change in job duties or failure to promote. During trial, Zimlich was allowed a trial amendment pursuant to an oral request to change the allegations of retaliation to those contained in the charge submitted to the jury.[4] However, Zimlich did not submit a *written* pleading in support of those issues until well after the trial was completed and the judgment signed.

■ A trial amendment must be filed as a written pleading; an oral statement at trial is insufficient to modify the pleadings. *See* Tex.R. Civ. P. 66, 67; *see also Matthews v. Gen. Accident Fire & Life Assurance Corp.,* 161 Tex. 622, 343 S.W.2d 251, 254 (1961); *Texas Gen. Indem. Co. v. Ellis,* 888 S.W.2d

830, 831 (Tex.App.—Tyler 1994, no writ). In the absence of a written pleading, submitting to the jury a charge containing the omitted issues is error. However, a complaint of any defect, omission, or fault in the pleadings is *waived* unless a specific objection is made thereto. *See* Tex.R. Civ. P. 274; Tex.R.App. P. 33.1. *The objection must be raised before submission of the charge to the jury.*

■ The City did not bring any pleading deficiencies to the attention of the trial judge. After inspecting the charge, the City affirmatively approved the charge and assented to its submission. The City has waived its first complaint.

In its second point, the City argues the evidence is legally and factually insufficient to support the jury's finding that the City discriminated against Zimlich. The City's challenge consists of a two-part argument regarding causation. First, the City argues that Zimlich failed to show retaliatory intent on the part of either Donoho or Paniagua, the supervisors who ultimately made the decisions regarding Zimlich's job assignments and promotions; and, the City contends, absent a showing that these two supervisors acted with a retaliatory intent, Zimlich cannot prevail on his claim of discrimination. Second, the City argues that Zimlich did not meet the burden, established by *Hinds,* to show that "but for" his report the City's prohibited conduct would not have occurred when it did. *See Texas Dep't of Human Servs. v. Hinds,* 904 S.W.2d 629, 636 (Tex. 1995).

When deciding a legal-sufficiency point, an appellate court considers only the evidence and inferences tending to support the jury findings, disregards all evidence and inferences to the contrary, and reverses a judgment only if no evidence supports the findings. *Alm v. Aluminum Co. of Amer.,* 717 S.W.2d 588, 593 (Tex.1986), *cert. denied,* 498 U.S. 847, 111 S.Ct. 135, 112 L.Ed.2d 102 (1990); *Wichita County v. Hart,* 892 S.W.2d 912, 923 (Tex.App.—Austin 1994), *rev'd on*

---

3. As stated above, the Act was amended in 1995 after the events relevant to this appeal. We will refer to the previous version.

4. When Zimlich requested the trial amendment the City responded, "For a clean record, Your Honor, we're not objecting to the trial amendment."

*other grounds,* 917 S.W.2d 779 (Tex.1996). When deciding a factual-sufficiency point, the appellate court considers all of the evidence and sets aside a finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Hart,* 892 S.W.2d at 923. The jury's finding must be upheld unless it is so against the great weight and preponderance of the evidence as to be manifestly unjust or erroneous. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986). We are not free merely to substitute our judgment for the jury's. *Herbert v. Herbert,* 754 S.W.2d 141, 142 (Tex. 1988).

Zimlich alleged the City discriminated against him, in violation of the Texas Whistleblower Act, as a result of his reporting that his supervisors in CED, Davis and Mendoza, hindered his criminal investigation of the Peters site. The City argues that because the alleged acts of discrimination did not occur while Zimlich was in the CED division, but after he had been transferred back to the Marshal's Office, and because the alleged acts of discrimination were carried out by City employees outside CED, Zimlich cannot show the requisite causal connection between his report and the acts of retaliation.

■ We disagree. As we stated in *Texas Department of Human Services v. Green,* 855 S.W.2d 136, 144 (Tex.App.—Austin 1993, writ denied), the Whistleblower Act does not protect an employee solely against the acts of an individual supervisor; it seeks to protect the individual employee against collective acts of the agency, the bureaucracy, the institution, and the system that retaliates. The language of the Act reflects this goal: it imposes liability on "local government[s]," which includes municipalities such as the City of Fort Worth, rather than specific employees or specific departments. *See* Former Act §§ 554.001(2), 554.002.

Nor did the jury question in this case pinpoint an individual or a department to whom the discrimination might be imputed. The jury was asked:

> Did the *City of Fort Worth* discriminate against Julius Zimlich—by changing his job duties, or by failing to promote him to senior deputy (sergeant), or by failing to promote him to chief deputy—in retaliation for reporting a violation of law to an appropriate law enforcement authority?

(emphasis added). The "City of Fort Worth" is a legal entity that includes both the CED and the Marshal's Office; and, in fact, the two departments operated the S.W.E.E.P. program jointly.

■ The pertinent question is the one always asked in a discrimination case; namely, whether Zimlich's report was a cause of the discrimination alleged. In this regard, an employee need not prove that reporting the illegal conduct was the *sole* reason for the employer's adverse action. *Hinds,* 904 S.W.2d at 634. Rather, "[t]he employee's protected conduct must be such that, without it, the employer's prohibited conduct would not have occurred when it did." *Id.* at 633; *Texas Natural Resource Conserv. Comm'n v. McDill,* 914 S.W.2d 718, 722 (Tex.App.—Austin 1996, no writ). The *Hinds* causation test has been described as a "but for" causal nexus requirement. *McDill,* 914 S.W.2d at 723.

■ We believe the evidence permits a reasonable inference that "but for" Zimlich's protected activity, he would not have suffered the discrimination found by the jury. Zimlich's evidence, pertaining to his allegations that the City discriminated against him by changing his job duties, showed the following: (1) after his return to the Marshal's Office, Zimlich was ordered to sit at the courthouse metal detectors; (2) the post was ordinarily filled by rookies or retirees wanting an extra paycheck; (3) experienced employees regarded the post as humiliating work or as "punishment" duty; (4) Zimlich was an experienced deputy; (5) Zimlich and Estorga were the only experienced deputies assigned to the metal detectors on a permanent basis; (6) the post was Zimlich's first assignment after the Peters' incident; (7) during Zimlich's assignment at the metal detectors, positions were open in the warrants division where Zimlich worked before his assignment at S.W.E.E.P. but Zimlich remained at the metal detectors for over eight months; (8) when Zimlich asked Donoho

when he would get a better assignment, Donoho told him he was lucky to have a job after the "Peters incident."

The City contends Donoho did not assign Zimlich to the metal detectors in retaliation for Zimlich's report. Donoho explained that he assigned Zimlich to the metal detectors because Zimlich had "emotional problems" after his return from the S.W.E.E.P. program. According to Donoho, Zimlich was in a fragile emotional state because Davis and Mendoza had treated him unfairly in CED. Donoho also indicated that Zimlich was not prepared for duty on the streets because his emotional problems caused him to take medication that made him sleepy.

We believe the jury reasonably could have rejected Donoho's explanation as dissembling or manufactured and thus indicative of bias, or simply unconvincing or beside the point. Certainly the jury were not bound to believe Donoho's explanation. After the Peters incident, both Zimlich and Estorga were assigned to the metal detectors even though Estorga was not shown to be on medication or suffering emotional problems. There is also evidence that Zimlich's "emotional problems" were created by Donoho's posting him at the metal detectors rather than the other way around.

In all events, even if one takes as true Donoho's contention that Zimlich was having emotional problems that made him unfit for duty in the warrants division, that contention would not discount the causal link between Zimlich's report and the City's assigning him to an undesirable post. The cause of Zimlich's emotional problems, according to Donoho, was the adverse treatment Zimlich had suffered at the hands of Davis and Mendoza. Donoho's explanation for assigning Zimlich to the metal detectors, if believed, is that Davis and Mendoza had already ruined Zimlich's

ability to function effectively. In that case, Donoho simply continued or augmented the retaliation initiated by Davis and Mendoza.

The jury could also have believed that "but for" his report, Zimlich would have been promoted to Chief Deputy. Although such a finding is intrinsically speculative, it would be reasonable under the evidence.[5] As stated previously, Zimlich was considered an "up and coming" young officer. His peers respected his good leadership qualities and expected him to assume a supervisory role in the department. According to a fellow deputy, Zimlich was in "at least the top five [percent]" of the deputies in terms of ability. There is evidence that the City Marshal who replaced Donoho expressed an intent to promote Zimlich to Chief Deputy. Zimlich's evaluations and experience were considered excellent.

The testimony indicated that five candidates, including Zimlich, applied for the Chief Deputy position. According to the uncontroverted testimony of a deputy in the Marshal's Office—an officer with twenty-six years of law enforcement experience—Zimlich was the most qualified of the five applicants. He had the most education, experience in the office, and advanced certification. According to the evidence, the person ultimately selected for the Chief Deputy position did not possess even the basic qualifications for the job; the Marshal's Office had to waive the requirements for him to apply.

The City argues that Zimlich was not selected because he had recently received negative comments on his evaluations and had been disciplined for insubordination. The jury reasonably could have concluded that both the evaluation and the disciplinary actions resulted from a discriminatory animus. After receiving an excellent evaluation the

---

5. Issues often considered in determining whether discrimination exists in a failure to promote case include: (1) whether an employee applied for or was qualified for a promotion; (2) the existence or nonexistence of previous criticism of the plaintiff's performance; (3) the plaintiff's value to the employer in his or her existing position; (4) whether the decision was based primarily on standards not previously articulated; (5) other comparative evidence suggesting disparate treatment; (6) the consistency of the employer's as-

serted reasons for denying plaintiff the promotion; (7) any history of discrimination by the employer; (8) whether the identified decisions themselves were based on reliable information and untainted by bias; (9) whether the employer complied with its own promotion procedures or its own affirmative action plan, and whether the job's criteria were changed to fit a preselected candidate. See Barbara Lindeman and Paul Grossman, *Employment Discrimination Law* 725–730 (3rd ed.1996).

previous year, Zimlich's first evaluation following the Peters incident included several negative comments, particularly that Zimlich was not a "team player" and that he was "badge-heavy." [6] The comment that he was not a "team player" might have been viewed by the jury as meaningless in light of the fact that Zimlich was required to work independently for most of the review period; the City introduced no evidence to controvert the rather obvious implication that the comment simply referred to Zimlich's failure to capitulate to Davis regarding the Peters' landfill. The same applies to the comment that Zimlich was "badge-heavy." The inference can reasonably be drawn that Zimlich was marked as "badge-heavy" only because Davis stated in his anonymous report to the City Council that Zimlich was "about to arrest" Peters. The jury must have been persuaded by the uncontradicted evidence that Zimlich was *not* "about to arrest" Peters when Zimlich reported the illegal site to Davis: at the time of that report, Zimlich did not know who owned the property. Zimlich's adverse evaluations, therefore, might reasonably be viewed as originating in Davis's falsehoods.

The same applies to the disciplinary actions against Zimlich. As noted, before the incident he had never been reprimanded in his fourteen years of law enforcement. After the Peters incident, Zimlich was reprimanded and suspended several times. Zimlich strongly contested every disciplinary action taken against him and the grounds for them might reasonably be viewed by the jury as specious and retaliatory in themselves.

In one such incident, Mendoza suspended Zimlich for parking his personal vehicle in a City parking lot. No written policy prohibited the practice and deputy marshals regularly parked their vehicles in City lots. On a Friday, while Zimlich was out, Mendoza put a memo on Zimlich's desk telling him not to park his car in the City lot without approval from the parking attendant. Zimlich returned to his office too late to contact the parking attendant on Friday. He parked his car in the lot on Monday morning while he

searched for the parking attendant. He was suspended without pay for doing so. Zimlich's fellow deputies testified that they continue even now to park their personal vehicles in City lots and have never been told not to.

Several such incidents occurred, and Zimlich introduced evidence that he was either "set up" by his superiors or received unusually harsh discipline for his actions. Thus, the jury reasonably could have believed that the reasons given by the City for its failure to promote Zimlich all stemmed from Davis's and Mendoza's animosity or previous illegal actions toward Zimlich.

We conclude the jury's finding that the City of Fort Worth discriminated against Zimlich for his protected activity was neither without legally sufficient evidence nor against the great weight and preponderance of the evidence.

█ In its third point of error, the City contends the evidence is legally and factually insufficient to support the jury's finding that Zimlich reported a violation of law in good faith. *See* Former Act §§ 554.001(1); 554.002. The City argues that Zimlich's report was not made in good faith because CED was already aware of the illegal landfill and taking steps to clean up the property when Zimlich discovered it. A "[r]eport of the conduct CED was already monitoring is not a report that can reasonably be believed to be the cause of retaliation," according to the City.

█ In order for a whistleblower to meet the element of good faith required by the Act, the evidence must show that: (1) the employee subjectively believed that the conduct reported was a violation of law; and (2) the employee's belief was objectively reasonable in light of the employee's training and experience. *Wichita County v. Hart*, 917 S.W.2d 779, 784 (Tex.1996).

The City's theory that Zimlich's efforts followed and duplicated CED's is not convincing and the jury reasonably could have rejected it in light of the evidence. First,

---

**6.** "Badge-heavy" denotes overzealous enforcement of the law. According to the witness David M. Horton, Director of the Criminal Justice Pro-

gram at St. Edward's University, the quality is usually found in newly commissioned officers, but rarely in experienced officers.

because CED and S.W.E.E.P. officers had different duties and powers, Zimlich's actions could be considered different in kind from those taken by CED. Zimlich was empowered to enforce state laws pertaining to the Peters site, not merely the City ordinances that CED was empowered to enforce.

More importantly, even if Zimlich was aware of any clean-up orders given Peters by CED—an issue disputed in the evidence—CED's order was itself illegal. CED's order that Peters bury the waste materials violated the contract between the City and the State and state law: individuals responsible for illegal waste materials were required by state law to *remove* them from unauthorized sites as opposed to *burying* them. CED's order gave Zimlich no reason to consider the matter resolved, but instead could have confirmed his belief that CED officials were consciously helping Peters evade the law.

According to Zimlich, in his fourteen years of law enforcement he had "[n]ever, ever, in any kind" of case encountered efforts to hinder his law-enforcement work. Zimlich reasonably could have believed, under the evidence, that Davis's and Mendoza's effort to stop his investigation constituted an illegal attempt to hinder his legitimate criminal investigation. Based on this belief, Zimlich reported their actions to the District Attorney's office.[7] We find the evidence sufficient to support a jury finding that Zimlich reported a violation of law in good faith. We overrule point of error three.

*Exemplary Damages*

In points of error four, five, and six, the City assails the jury's award of exemplary damages because (1) there is insufficient evidence to support the finding of malice necessary to impose exemplary damages, (2) the jury had insufficient information on which to calculate the award, and (3) the amount is excessive.

■ A finding of malice is a prerequisite to an award of exemplary damages under the Whistleblower Act. *See City of San Antonio v. Heim*, 932 S.W.2d 287, 293 (Tex.App.—Austin 1996, writ denied). The City correct-

ly states that Zimlich had the burden of proving actual malice. The substance of the City's argument is that the evidence does not show that either Donoho or Paniagua, the officials directly responsible for Zimlich's work assignment and rank, harbored malice toward Zimlich.

In *Continental Coffee Products Company v. Cazarez*, 937 S.W.2d 444, 452 (Tex.1996) the supreme court defined "malice" as "ill-will, spite, evil motive, or purposing the injury of another." The City argues that the evidence is legally and factually insufficient to support a finding that the City acted with the intent required by *Cazarez*.

The record shows, however, the jury was not given the *Cazarez* definition. The issue of malice was, without objection, submitted to the jury with the following definition:

> You are instructed that "malice" means (a) conduct in retaliation that is intended by the City of Fort Worth to cause Mr. Zimlich substantial injury, or (b) an act carried out by the City of Fort Worth with a flagrant disregard for the rights of Zimlich and with actual awareness on the part of the City of Fort Worth that the act will, in reasonably probability, result in harm.

■ Regardless of whether one uses the *Cazarez* definition or the one actually submitted at trial, however, we believe the evidence supports the jury finding of malice. The evidence shows that Davis, a City official, composed and delivered his report to the City Council under false colors and with actual awareness that the report would result in harm to Zimlich's reputation and career. The jury could have believed that Donoho and Paniagua tacitly condoned Davis' malicious and inaccurate portrayal of Zimlich's conduct by giving it practical effect as if the report were true, and discriminated against Zimlich as a result. In sum, the evidence suggests that City officials in CED deliberately undermined Zimlich's reputation, credibility, and employment record to discourage him from enforcing the law or as punishment for doing so, and that this tactic was endorsed by City officials in a related depart-

---

7. Expert testimony at trial indicated that reporting the matter to the District Attorney's office

was the correct alternative to pursue under the circumstances.

ment. This constitutes ample evidence to support a finding that the City of Fort Worth acted with malice. We overrule the City's fourth point of error.

The City contends in point of error six that the exemplary damages were excessive. Whether an award of punitive damages is excessive is measured by the factors set out in *Alamo National Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex.1989). Those factors include:

> (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; and (5) the extent to which such conduct offends a sense of justice and propriety.

*Id.* The amount of punitive damages is, of course, largely within the jury's discretion. We may reverse a punitive-damage award or suggest a remittitur only if we determine the evidence supporting the award is factually insufficient or the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 30 (Tex.1994); *see also Pool,* 715 S.W.2d 629 at 635.

In order to assess the reasonableness of a punitive-damage award, we are required to detail the relevant evidence and explain why, in light of the *Kraus* factors, the evidence either supports or does not support the punitive-damage award. *Ellis County State Bank v. Keever,* 888 S.W.2d 790, 798 (Tex.1994); *Moriel,* 879 S.W.2d at 31. We must assess the nature of the wrong in light of the purposes underlying the Whistleblower Act: (1) protecting public employees from retaliation by their employers for reporting violations of law in good faith, and (2) securing in consequence lawful conduct on the part of those who direct and conduct the affairs of public bodies. *See Lubbock County v. Strube,* 953 S.W.2d 847, 860 (Tex.App.—Austin 1997, pet. filed); *Travis County v. Colunga,* 753 S.W.2d 716, 718–19 (Tex.App.—Austin 1988, writ denied). We have heretofore detailed the evidence at length.

We believe the retaliation shown by the evidence is precisely the kind of wrongdoing that punitive damages were meant to punish and deter. We have spoken previously of the importance of public trust in law-enforcement officers. *See Heim,* 932 S.W.2d at 294. The trust of the public in government—in its officials and its processes—is indispensable in any tolerable form of government. The public trusts law-enforcement officers because of (1) their sworn duty to uphold the law and enforce it impartially, and (2) the prudence and discretion with which they ordinarily exercise the awesome discretionary powers vested in them as peace officers to secure public safety and order. *Id.* The trust is not immortal, it may be injured, it may even be annihilated. When government officials abuse their powers, as the jury found they did in this instance, by preventing peace officers from enforcing the law, the abuse immediately impairs the ability and willingness of peace officers to protect the health and safety of the public. And if repeated often enough, abuses of that kind eventually sicken the public and destroy its trust not only in peace officers but in *all* government processes. The deterrent effect of punitive damages is particularly apt in such cases.

The evidence reasonably permitted the jury to believe that Zimlich's supervisors wrongfully attempted to coerce Zimlich to violate his sworn duties. When Zimlich was not moved, his supervisors intentionally undermined his professional reputation, the jury could have reasoned, by creating and distributing a disparaging report composed by the very official accused of wrongdoing. Davis' denigrating report, cloaked as an independent evaluation of Zimlich's actions, ensured the destruction of the reputation Zimlich had earned by fourteen years of excellent law-enforcement work. The written report perpetuated the wrong. Zimlich was marked as a bad peace officer and this assessment was disseminated to and accepted without question by CED, City Services, the City Council, the Mayor's Office, and the Marshal's Office. Closely following the report were poor evaluations of Zimlich's performance and a quick halt to his ascending career.

The evidence shows that Donoho ultimately assigned Zimlich to a post at the courthouse metal-detectors, and as much as admitted the assignment was "because of the Peters incident." The post was the lowest rung on the assignment ladder, and Zimlich endured in consequence the taunting of his peers. The effects of negative publicity and poor job assignments on Zimlich's health will be discussed below in relation to mental-anguish awards.

Zimlich's treatment had, moreover, a disturbing effect on his fellow deputies: they attributed Zimlich's poor treatment to his efforts to investigate the Peters property. They testified they believed Zimlich's treatment was punishment for trying to do the right thing. Such an observation tends to hinder doing "the right thing." Good faith law enforcement is thus intimidated. The need to deter public officials who punish peace officers for their bona fide attempts to enforce the law is obvious.

We conclude in light of the *Kraus* factors that we may not set aside the sum awarded here as punitive damages on the ground that it is disproportionate to the severity of the wrongs and not reasonably related to the objectives of punishment and deterrence underlying such awards. We overrule point of error six.

■ The City next argues that the evidence was legally and factually insufficient to support an award of exemplary damages because no evidence was presented regarding "the budget for the City Marshal's Office, the City's financial obligations, or the City's revenues or tax resources." The City argues that evidence of a defendant's financial strength is an important factor in an award of exemplary damages because "[t]hat which could be an enormous penalty to one may be but a mere annoyance to another." *Moriel,* 879 S.W.2d 10 at 29. Because no such evidence was presented to the jury, the City argues, the jury had no context within which to calculate an appropriate amount of exemplary damages.

We do not believe Zimlich was required to introduce evidence of the City's financial condition in order to recover exemplary damages. In fact, before 1988 evidence of a defendant's net worth was neither subject to discovery nor admissible as evidence for the purpose of damage awards. *Young v. Kuhn,* 71 Tex. 645, 9 S.W. 860, 862–63 (1888); *Lunsford v. Morris,* 746 S.W.2d 471, 472 (Tex.1988). This prohibition was based on a long-standing belief that the injury inflicted was a more important consideration than the ability of a defendant to pay. *See id.* In *Lunsford,* the supreme court held for the first time that evidence of a defendant's net worth was "relevant" to a determination of punitive damages and was therefore discoverable. *Id.* at 473. Although *Lunsford* indicated that admission of such evidence might give a jury a better context within which to award punitive damages, we do not construe the opinion as *requiring* the plaintiff to introduce such evidence as a prerequisite to recovering punitive damages.[8] We overrule point of error five.

*Lost Earnings*

In its seventh point of error, the City challenges the jury award of $200 for lost earnings in the past.[9] Zimlich voluntarily remits the $200, and we need not discuss the merits of the point. In its eighth and ninth points of error, the City argues that the evidence is legally and factually insufficient to support the award for future lost earnings, and that the amount awarded is excessive.

■ Recovery for future lost earnings is available under the Whistleblower Act. *See Housing Authority of City of Crystal City v. Lopez,* 955 S.W.2d 152, 157 (Tex.App.—Austin 1997, no writ); *City of Ingleside v. Kneuper,* 768 S.W.2d 451, 457 (Tex.App.—Austin 1989, writ denied). The City argues that its

---

8. Moreover, Davis conceded on cross-examination that the City's annual operating budget was about $240 million. While this was a broad figure, it was not rebutted by the City and sufficed in our view to give the jury some context within which to assess the overall effect of its punitive damage award. The City was free, of course, to offer its own evidence if it believed the $240 million was not a true, accurate, or fair context standing alone.

9. This award for lost earnings in the past was part of Zimlich's $300,200 award for past and future earnings.

decision not to promote Zimlich had no reasonably quantifiable future effect; thus, the evidence did not support an award of future lost earnings.[10]

A plaintiff cannot be expected to prove future lost earnings with absolute certainty. But the mere fact that lost future earnings are inherently speculative will not defeat an award so long as the plaintiff proves the amount of such damages with the degree of certainty of which it is susceptible. *Bonney v. San Antonio Transit Co.*, 160 Tex. 11, 325 S.W.2d 117, 121 (1959). A jury verdict must, of course, be based on something more than mere conjecture; it must be an intelligent judgment, based on such facts as are available. *McIver v. Gloria*, 140 Tex. 566, 169 S.W.2d 710, 712 (Tex.1943). Beyond that, the amount that the plaintiff might have earned in the future must be left largely to the sound judgment and discretion of the jury. *Id.*

Zimlich testified that if he had been promoted to Chief Deputy in October 1996, he would have earned an additional $1,000 per month. He estimated that he would continue to work for another thirty years, until age sixty-five. Thirty years at $12,000 per year totals $360,000. The City did not dispute these amounts. Under the circumstances, we believe the jury's $300,000 award was not based on "mere conjecture," but was supported by the kind of proof of which such damages are susceptible. *See Hughett v. Dwyre*, 624 S.W.2d 401, 408–09 (Tex.App.—Amarillo 1981, writ ref'd n.r.e.); *see also Maritime Overseas Corp. v. Ellis*, 886 S.W.2d 780, 798 (Tex.App.—Houston [14th Dist.] 1994, writ denied) (award of $1,890,000 for future lost wages upheld although predicated upon jury's assumption that plaintiff would have been promoted).

Zimlich testified he was not asking for the full amount proven, but would be adequately compensated if the jury awarded him damages for eight years of future lost wages, or $96,000. The City argues on appeal that Zimlich's recovery should be limited to this amount. We disagree. Zimlich did not make an *admission* that he suffered only $96,000 in damages; rather, he testified to the full $360,000 in damages but told the jury he would be satisfied with a lesser amount. The jury were bound by the language of the charge in calculating damages and chose to give Zimlich the full amount supported by the evidence. It was within the jury's discretion to do so. *See El Paso Healthcare Sys. Ltd. v. Piping Rock Corp.*, 939 S.W.2d 695, 700–701 (Tex.App.—El Paso 1997, writ denied) (where plaintiff testified that $351,000 would adequately compensate company, but other evidence showed $550,000 in actual losses, jury award of $440,000 was within the range supported by the evidence). Because we find the award for lost future earnings within the range supported by the evidence, we overrule the City's eighth and ninth points of error.

*Mental Anguish*

The jury awarded Zimlich $300,000 in damages for mental anguish. In its tenth and eleventh points of error, the City challenges the award.

The City argues that the evidence failed to show that the City was responsible for the anguish because Zimlich failed to show a "culpable mental state on the part of the defendant." *See State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 435 (Tex.1995) (culpable mental state on part of defendant required in DTPA claim). The City argues in substance that because Zimlich failed to show that either Donoho or Paniagua, his supervisors in the Marshal's Office, harbored any retaliatory intent, he is not entitled to damages for mental anguish.

We have discussed this issue previously in regard to the jury's finding of malice. We again note that the Whistleblower Act holds *municipalities*, not individual employees, liable for retaliation. *See* Former Act § 554.001(2)(B). The evidence supports a finding that City employees unjustifiably and falsely portrayed Zimlich as a bad peace

---

10. The City also argues that (1) no pleadings support the award, and (2) there is insufficient evidence to support a finding of discrimination as a predicate to an award of lost earnings. As stated previously, the City waived any objections regarding the pleadings; and we have already upheld the jury finding of discrimination.

officer and that Donoho and Paniagua tacitly endorsed the discriminatory report. The fact that they did not *initiate* the retaliation, but merely furthered it in a practical way, cannot shield the City from liability for the retaliatory acts of its culpable officials. *See Heim*, 932 S.W.2d at 293.

 Given that we have found evidence to support the City's liability under the Act, we turn to Zimlich's entitlement to damages for mental anguish based on the kind and severity of his suffering shown in the evidence. A plaintiff may establish the fact of mental anguish by direct evidence of the nature, duration, or severity of suffering that resulted in a substantial disruption of his daily routine. *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex.1995). Absent such direct evidence, an award of damages may be supported by evidence that a plaintiff suffered a high degree of mental pain and distress that is more than mere worry, anxiety, anger, vexation, or embarrassment. *Id.; Kneuper*, 768 S.W.2d at 460. We believe Zimlich introduced evidence of the required quality.

 After reporting the illegal disposal site, Zimlich saw his career deteriorate. From performing active, independent, investigatory duties he was reduced to a job ordinarily reserved for rookies and retirees. His partner, Estorga, stated that the change had a great effect on Zimlich because of Zimlich's past performance and career expectations: "[F]or Mr. Zimlich, he was looking to be the next chief deputy. He had high expectations in the department.... And you could see that it was just taking its toll, that we didn't know if we were ever going to get off there." Zimlich's mother testified that during the time Zimlich was stationed at the courthouse he became very depressed. The events had a "devastating effect [on Zimlich's] life," when "he had worked so hard for what he thought was the right thing" and saw all of it "bursted in a bubble."

After his transfer, Zimlich got stomach aches and headaches and suffered from depression and insomnia. For the first time in his life he sought psychiatric help and told his psychiatrist about the problems he was experiencing at work. His psychiatrist pre-scribed antidepressants and drugs to help him sleep. Zimlich's condition deteriorated. He became despondent, believing there was "no way out."

This evidence is sufficient in our view to support a reasonable belief that Zimlich suffered severe mental suffering that substantially disrupted his daily routine. *See Woodruff*, 901 S.W.2d at 434.

The City argues next that the amount awarded by the jury is excessive because Zimlich's attorney told the jury during in closing argument that Zimlich was seeking only $240,000 in damages for mental anguish. Consequently, the City asks for a remittitur of $60,000, the amount awarded by the jury in excess of the $240,000.

 Jurors are best positioned to determine from their own experience the extent to which a defendant's conduct caused compensable mental anguish. *Kneuper*, 768 S.W.2d at 460. Despite the statement by Zimlich's counsel, the jury was bound by the language of the charge and was free to weigh the evidence of mental anguish and assign it the weight reflected in their verdict. For these reasons, we cannot hold excessive the sum found by the jury for mental anguish. *See Pope v. Moore*, 711 S.W.2d 622, 624 (Tex.1986); *Heim*, 932 S.W.2d 287 at 296.

 The City argues finally that the evidence is insufficient to show that Zimlich's work assignment or other work-related difficulties caused the stress because he was having domestic problems at the time that were ample cause for any worry or distress he may have felt. *Texarkana Memorial Hosp. v. Murdock*, 946 S.W.2d 836, 838 (Tex. 1997) (where more than one cause of injury is involved, evidence must show that defendant caused the injury for which he is held liable). The City apparently bases this contention on Donoho's testimony that Zimlich was involved in a difficult child-custody and divorce dispute at the time he experienced the mental suffering described.

Zimlich responds that the evidence shows his divorce became final in 1992, well before he began having difficulties at work. Donoho, who originally made the statement attrib-

uting Zimlich's suffering to his domestic situation, conceded on cross-examination that perhaps he was mistaken about the time of the divorce. The evidence shows that Zimlich's divorce and his job difficulties were well-separated in time. Moreover, Zimlich's mother testified that her son's depression was not caused by his domestic situation. Against the contention that Zimlich's mental anguish came from causes outside his employment, we conclude there is sufficient evidence to support the jury finding that the City's treatment of Zimlich caused him to suffer the mental anguish described. We overrule the City's tenth and eleventh points of error.

*Venue*

In its twelfth and final point of error, submitted in a supplemental brief, the City argues that the trial court erred by denying the City's motion for change of venue.

■ The Whistleblower Act, as it existed when Zimlich's cause of action accrued, provided that a plaintiff may bring suit in the county in which he resides or in Travis County. *See* Former Code § 554.007. Zimlich sued in Travis County. The City filed a motion to transfer venue, arguing that Tarrant County was the appropriate venue because, among other things, the parties and witnesses involved were located in Tarrant County, the cause of action accrued there, and the parties would be inconvenienced by trying the case in Travis County. The trial court overruled the motion.

The supreme court held in *Wichita County v. Hart*, 917 S.W.2d 779, 782 (Tex.1996) that the venue provision of the Whistleblower Act, allowing a plaintiff to file suit either in Travis County or in the county in which he resides, is permissive.[11] If all applicable venue provisions are permissive, and one does not dominate another, and if the action is brought in a county that is proper under one, the venue of the action will be sustained against a defendant's motion to transfer. *See* 2 *McDonald Texas Civil Practice* § 6:8 (1992); *Lakeside Irrigation Co. v. Markham Irrigation Co.*,

116 Tex. 65, 285 S.W. 593, 598 (1926). *See also* Tex.R. Civ. P. 86(1), 255; 2 *McDonald* § 6.34 ("If venue is in a permissive county, and there is no mandatory exception, then it appears that venue will not be transferred to another permissive venue county, unless the parties agree or . . . a fair and impartial trial is unavailable in the county of suit."). The City points to no mandatory provision that would override the permissive venue prescribed in the Whistleblower Act.

■ The City argues, however, that if the Act allows a plaintiff to sue in Travis County without any rational reason, even when such venue works a hardship on the defendant, the venue provision is unconstitutional because it violates the constitutional guarantee of due process of law. We stated previously that

> [m]unicipal corporations and other government subdivisions derive their existence and powers from legislative enactments and are subject to legislative control and supremacy. Consequently, they cannot use the sword of the due-process-of-law and other provisions of Article I to invalidate the laws that govern them.

*Texas Workers' Compensation Commission v. City of Bridge City*, 900 S.W.2d 411, 413 (Tex.App.—Austin 1995, writ denied) (citations omitted).

■ In all events, the City did not negate the existence of a rational reason for venue in Travis County. The trial court recognized the inconveniences of venue in Travis County but seemed to believe that Travis County might serve as a "safe harbor" for a fair trial of Zimlich's claims. Although the supreme court in *Hart*, 917 S.W.2d at 782, found nothing to suggest that the legislature intended the venue provision of the Act to create a "safe harbor" for plaintiffs, that holding does not preclude a trial court from deciding that, under the circumstances of a particular case, venue in Travis County is not inappropriate. *See, e.g.*, Tex. Civ. Prac. & Rem.Code Ann. § 15.002(b) (West Supp.1998) (in deciding

---

11. Because the case involved a county, section 15.015 of the Texas Civil Practice and Remedies Code applied: "[a]n action against a county *shall* be brought in that county." (emphasis added).

Tex. Civ. Prac. & Rem.Code Ann. § 15.015 (West 1986). The venue provisions in the present dispute are, in contrast, permissive.

whether to grant defendant's motion for change of venue from one permissive venue to another, trial court may weigh and balance interests of all parties). We overrule the City's twelfth and final point of error.

For the reasons given, we affirm the judgment of the trial court.